## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CANCER RESEARCH )<br>TECHNOLOGY LIMITED )<br>and SCHERING CORPORATION, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>BARR LABORATORIES, INC., and )<br>BARR PHARMACEUTICALS, INC. )<br>)<br>Defendants. )<br>) | C.A. No. 1:07 cv 00457 (SLR)<br><br>**PUBLIC VERSION** |

**BARR LABORATORIES, INC.'S AND BARR PHARMACEUTICALS, INC.'S BRIEF IN
OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE THE EXPERT REPORT OF
DR. NANCY LINCK AND PRECLUDE HER FROM TESTIFYING**

John C. Phillips, Jr. (#110)
Brian E. Farnan (#4089)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom St.
Wilmington, DE 19806
Tele:  (302) 655-4200
Fax:  (302) 655-4210

George C. Lombardi (admitted *pro hac vice*)
Taras A. Gracey (admitted *pro hac vice*)
Lynn M. Ulrich (admitted *pro hac vice*)
Ivan M. Poullaos (admitted *pro hac vice*)
Julie Mano Johnson (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Tele: (312) 558-5600
Fax: (312) 558-5700

*Attorneys for Defendants Barr Laboratories,
Inc. and Barr Pharmaceuticals, Inc.*

Dated:  February 23, 2009

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS ....................................................................3

SUMMARY OF ARGUMENT ...............................................................................................4

STATEMENT OF FACTS .....................................................................................................5

I. The Prosecution of the '291 Patent...................................................................................5

II. Dr. Linck's Expert Report and Proffered Testimony .................................................9

ARGUMENT ....................................................................................................................10

I.      Dr. Linck's Expert Report and Testimony Do Not Run Afoul of This Court's
        Guidelines .........................................................................................................10

        A. Because of the Nature of Prosecution Laches, This Case Presents Extraordinary
           Circumstances and the Proffered Testimony Extends Beyond Introductory PTO
           Practice and Procedure.................................................................................11

        B. The Proffered Testimony Will Not Constitute Legal Testimony That Invades the
           Province of the Court and It Is Not Legal Advocacy .................................14

II.     Dr. Linck's Proffered Testimony Will Assist the Court, Consistent with Federal Rule
        of Evidence 702 and the Rulings in Other Prosecution Laches Cases ...........15

III.    Dr. Linck Is Eminently Qualified to Provide Testimony in This Case...............18

        A. Dr. Linck's Knowledge and Experience Qualify Her Under Rule 702 to Testify As to
           the Prosecution of Patents, Including the Specifics of the PTO Policy on the Utility
           Requirement...................................................................................................18

        B. Plaintiffs' Criticisms of Dr. Linck Constitute a Disagreement with the Substance of
           Her Opinions and Not Her Qualifications. ...................................................20

IV.     Plaintiffs' Request for Drastic Relief Is Unwarranted......................................24

V.      Plaintiffs Are Not Entitled to Costs ...................................................................25

CONCLUSION..................................................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Berg Elec., Inc. v. Molex, Inc.*, C.A. No. 94-470-RRM
  (D. Del. Sept. 26, 1995) ................................................................................17

*Boehringer Ingelheim Int'l GMBH v. Barr Labs., Inc.*, C.A. No. 05-700-JJF
  (D. Del. Feb. 7, 2008) ............................................................................. 16-17

*Chamberlain Group, Inc. v. Interlogix, Inc.*, No. 01 C 6157, 2002 WL 653893
  (N.D. Ill. April 19, 2002) ..............................................................................24

*Daiichi Pharm. Co. v. Apotex, Inc.*, No. 03-CV-937 (WGB), 2005 U.S. Dist. LEXIS 26062
  (D. N.J. Nov. 1, 2005) ............................................................................. 19-20

*F. Hoffmann-LaRoche, Ltd. v. IGEN Int'l, Inc.*, C.A. No. 98-318-JJF
  (D. Del. Oct. 24, 2000) .................................................................................16

*Hynix Semiconductor, Inc. v. Rambus, Inc.*, 2007 WL 4209386
  (N.D. Cal. Nov. 26 2007) ..........................................................................13, 16

*In re Bergel*, 292 F.2d 958 (CCPA 1961) ..................................................................22

*In re Brana*, 51 F.3d 1560 (Fed. Cir. 1995) .........................................................21, 22

*In re Citron*, 325 F.2d 248, 139 USPQ 516 (CCPA 1963) ..............................................21

*In re Hartop et al.*, 311 F.2d 249, 135 USPQ 419 (CCPA 1962) .....................................21

*In re Krimmel*, 292 F.2d 948 (CCPA 1961) ..............................................................22

*Intuitive Surgical, Inc. v. Computer Motion, Inc.*, C.A. No. 01-203-SLR
  (D. Del. July 30, 2002) ...............................................................................1, 12

*Lucas Aerospace v. Unison Indus., L.P.*, C.A. No. 93-525-JJF
  (D. Del. Mar. 9, 1995) ..................................................................................17

*Reiffin v. Microsoft Corp.*, 270 F. Supp. 2d 1132 (N.D. Cal. 2003) ........................ 11, 12, 13

*Sundance Inc. v. DeMonte Fabricating, Inc.*, 550 F.3d 1356 (Fed. Cir. 2008) .................16, 19

*Symbol Technologies, Inc. v. Lemelson*, 301 F. Supp. 2d 1147 (D. Nev. 2004) ...................16

*Tafas v. Dudas*, 511 F. Supp. 2d 652 (E.D. Va. 2007) .............................................16, 24

*Thorn EMI N. Am. Inc. v. Micron Tech., Inc.*, C.A. No. 92-673-RRM
    (D. Del. Nov. 23, 1993) ..................................................................................................17

**Rules**

Federal Rule of Evidence 702..................................................................................................15, 18

## INTRODUCTION

Plaintiffs' motion to strike the expert report of Dr. Nancy Linck and to preclude her from testifying at trial should be denied in its entirety. Plaintiffs' contention that Dr. Linck's testimony runs afoul of this Court's Guidelines for Legal Expert Testimony and Federal Rule of Evidence 702 is clearly erroneous. This Court's Guidelines do not create a *per se* ban on patent prosecution expert testimony. Because Barr has raised the affirmative defense of prosecution laches, this case is precisely the type of "extraordinary circumstance" that is contemplated by the Court's Guidelines. The defense requires this Court to consider the tactics of the Applicants before the PTO to determine whether there was an unjustified and unreasonable delay in prosecution of the '291 patent.

This Court has allowed patent prosecution expert testimony in a prosecution laches case. *See Intuitive Surgical, Inc. v. Computer Motion, Inc.*, C.A. No. 01-203-SLR (D. Del. July 30, 2002)[1] (Ex. 1). Plaintiffs chose not to cite *Intuitive Surgical* or even one prosecution laches case in support of their position. Instead, Plaintiffs cite to cases that are inapposite because they involve situations where the expert was either going to opine on substantive patent law principles (*e.g.*, double patenting, obviousness) or simply walk through the file history.[2]

That is not the case here. Dr. Linck will not walk through the '291 patent file history or provide attorney argument on the ultimate issue of prosecution laches. On the contrary, Dr.

---

[1] Barr understands that *Intuitive Surgical* was decided before the Court's current Guidelines were adopted. However, Barr believes that Dr. Linck's testimony is consistent with the Court's current Guidelines because the defense of prosecution laches fits within the Court's "extraordinary circumstance" exception, for all the reasons set forth herein.

[2] Barr will not offer Dr. Linck to "walk-through" the '291 patent prosecution, as Plaintiffs suggest. (Pltfs. Br. at 5-6). The paragraphs of Dr. Linck's report pertaining to the prosecution history preserve her right to testify about aspects of the prosecution that relate to her opinions. It is absolutely predictable that Dr. Linck will refer to portions of the prosecution history because the defense of prosecution laches focuses on what happened during the prosecution at issue. The disclosure in her expert report preserves her ability to discuss those areas consistent with this Court's rule that expert testimony be contained within the scope of the expert report.

Linck will provide testimony that will aid the Court in its determination of whether Applicants unreasonably delayed the prosecution of the patent in suit.  To that end, Dr. Linck will provide information on the options available to Applicants to advance or delay the issuance of a patent, will compare the prosecution of the patent in suit with those of other analogous applications, will compare the prosecution time of the '291 patent to that of other patents in the field and will provide testimony concerning the benefits Applicants obtained through their delay.  All of this testimony will provide the Court with information that will assist the Court in evaluating Applicants' prosecution of this patent.

Ironically, Plaintiffs have declared their intention to provide expert testimony on some of the same topics they object to in Dr. Linck's testimony.  Plaintiffs intend to explain away the 11-year delay in prosecution by presenting their own patent prosecution expert, a lawyer, to testify about PTO policy concerning the utility requirement in anti-cancer patents.  Specifically, Plaintiffs' expert will testify that the PTO demanded evidence of successful human clinical data in the '291 prosecution and as a matter of general PTO policy.  Plaintiffs concede this testimony is within the Guidelines.  Dr. Linck will directly rebut such testimony by explaining that the PTO was not demanding such data, no such "policy" existed, and even if such data was requested, Applicants had data that would have been sufficient to overcome the PTO's utility rejection, but never submitted it.

Finally, Plaintiffs' contention that Dr. Linck is not qualified under Rule 702 because she was not a patent Examiner does not pass the straight-face test.  Plaintiffs have not cited a single case that holds that an expert must have examined patent applications to opine on patent prosecution.  As Plaintiffs well know, Dr. Linck has over 25 years of experience in patent prosecution gained as a patent prosecutor, Solicitor of the PTO, and an Administrative Patent

Judge in the PTO.  Moreover, as PTO Solicitor, Dr. Linck specifically examined the standard for utility applied to pharmaceutical patents during the time the '291 patent was under prosecution. Dr. Linck's knowledge and experience is unmatched by Plaintiffs' experts.  (Linck Report at Ex. A (Ex. 2)).

For all these reasons, Plaintiffs' motion should be denied.

## NATURE AND STAGE OF THE PROCEEDINGS

Dr. Linck's expert report addresses only issues related to Barr's prosecution laches defense.[3]  In response to Dr. Linck's report, Plaintiffs submitted expert reports from *two* patent lawyers (Messrs. Adelman and Wiseman).  (Ex. 3; Ex. 4).  Mr. Wiseman, a former PTO employee and a lawyer, comments on the prosecution history of the '291 patent, contends that the PTO had an evolving policy with respect to the utility requirement in the case of anti-cancer patents which required Applicants to submit "successful human clinical data" to support their claims, and concludes that the Applicants were reasonable to read the Examiners' Office Actions as consistent with those supposed policies.  (Ex. 4).  Plaintiffs' second expert report, that of Mr. Adelman, a law professor who has never worked in the PTO or prosecuted a pharmaceutical patent application, likewise analyzes the prosecution history, asserts that the Examiners' Office Actions required the '291 patent Applicants to submit "successful human clinical data" to support their claims, and opines that the PTO had a policy of requiring successful human clinical data to support an anti-cancer patent.  (Ex. 3).  After submitting the Wiseman and Adelman Reports, Plaintiffs filed a motion to strike Dr. Linck's expert report in its entirety and preclude her from testifying.  (Pltfs. Br. at Ex. 1).  At the Adelman deposition, Plaintiffs for the first time

---

[3] On December 8, 2008, Barr filed Dr. Linck's initial expert report which related to its prosecution laches and inequitable conduct defenses.  After the Court noted in a ruling on Plaintiffs' Email Request for Emergency Relief that it seldom permitted expert testimony by lawyers in patent cases, Barr submitted a revised report limiting Dr. Linck's testimony solely to the prosecution laches defense.  (Ex. 2).

stated that Mr. Adelman was testifying conditionally only and would not testify if Dr. Linck is excluded. (Adelman Dep. Tr. at 7 (Ex. 5)). Plaintiffs have indicated that they will seek to offer Mr. Wiseman's testimony even if this Court excludes Dr. Linck.[4] This is Barr's brief in opposition to Plaintiffs' motion to strike Dr. Linck's expert report and preclude her from testifying.

## SUMMARY OF ARGUMENT

1.     Dr. Linck's expert report and testimony do not run afoul of this Court's Guidelines for Legal Expert Testimony in Patent Cases or Federal Rule of Evidence 702.  The defense of prosecution laches in this particular case makes this an "extraordinary case," and this Court and other courts have allowed patent prosecution expert testimony in prosecution laches cases.  Dr. Linck's report and expected testimony do not extend either to legal advocacy or legal testimony that invades the province of this Court, but rather will address considerations relevant to the determination of prosecution laches including the options available to patent applicants to advance or delay prosecution, the duration and prosecution of the '291 patent compared to similar patents, whether the PTO had an "evolving approach" to utility whereby they demanded successful human clinical data to support anti-cancer claims generally, and whether the Examiners required successful human clinical data to prove utility during the '291 patent prosecution.

2.     Pursuant to Rule 702, Dr. Linck's testimony will be extremely helpful to the Court in understanding whether there was an unreasonable and unexplained delay in the prosecution of the '291 patent, as discussed *infra*.

---

[4] Mr. Wiseman's report states:  "I offer rebuttal of Ms. Linck's opinions in those areas conditionally, should she be permitted to testify.  I also understand that counsel for Plaintiffs have taken the view that expert testimony directed to the Patent Office's evolving policies concerning anti-cancer claims in the 1980s and early 1990s is appropriate in this case and will be helpful to the Court as the finder of fact.  I offer my opinions on that issue herein." (Ex. 4, pp. 1-2).

3.    Dr. Linck is eminently qualified to testify about patent prosecution based on her 25 years

of experience as a patent prosecutor, Solicitor of Patents and Trademarks for the PTO, and an

Administrative Patent Judge.   Dr. Linck also is uniquely qualified to rebut Plaintiffs' expert

testimony that the PTO had a policy of requiring successful human clinical data to support a

claimed invention's utility because as the PTO Solicitor, Dr. Linck was tasked with examining

the standard for utility as it had been applied to pharmaceutical patents during the time the '291

patent was under prosecution.

## STATEMENT OF FACTS

**I.    The Prosecution of the '291 Patent**

On August 23, 1982, Applicants, through their assignee May & Baker, filed with the

USPTO the first of 11 applications claiming a genus of compounds that they called tetrazine

derivatives (the '656 application). (Ex. 6).  Over the course of the next 9 years, Applicants did

nothing substantive to advance the prosecution.   Rather, Applicants filed the same application,

received the same rejection from the Examiner, filed a continuation application identical to the

previous application, and abandoned the previous application – for 10 applications.  Only after

temozolomide, one of the compounds encompassed by the '291 patent and the drug product at

issue in this case, showed commercial promise and Applicants, through May & Baker, had

licensed its patent rights to Cancer Research Campaign Technology ("CRCT") in 1991 and then

to Schering in 1992, did Applicants prosecute their patent by substantively responding to the

Examiner's Office Action.[5]  When they did, the Examiner allowed the patent immediately. (Ex.

7).

---

[5] Because the patent precedes GATT and thus the term of the patent runs 17 years from the date of patent issuance,
Applicants' delay in prosecution affected a substantial extension of the term of the '291 patent.

The first application in the 11 application chain, the '656 application, covered "new therapeutically useful compounds possessing antineoplastic [anti-cancer] and immunomodulatory activity [suppression or stimulation of the immune system]." (Ex. 6 at BARR_TEMO_023492).   In the specification, the Applicants stated that "[t]he new tetrazine derivatives of general formula I possess valuable antineoplastic activity, for example against carcinomas, melanomas, sarcomas, lymphomas and leukemias" and made conclusory statements that such activity had been shown in certain mouse tumor models.  However, the specification did not provide any underlying data to support the Applicants' assertions or show which compounds had any such alleged activity.  (Ex. 6 at BARR_TEMO_023460).  The application contained 26 compound claims, one composition claim, a method claim for the treatment of a malignant neoplasm such as carcinoma, melanoma, sarcoma, lymphoma or leukemia and a method claim for the treatment of a patient "with or requiring an organ graft or skin graft or suffering from an immunological disease." (Ex. 6 at BARR_TEMO_023484-91).

Shortly after filing, the PTO issued a restriction requirement.  In response, the Applicants elected treatment of leukemia as the method of use that they wanted examined with their application. (Ex. 8).  This was the one and only response the Applicants submitted to an Office Action from September 12, 1983 to February 5, 1993.  After receiving the Applicants' response, the PTO Examiner issued an Office Action dated November 18, 1983, in which he "objected" to the compound claims "pending clarification of utility." (Ex. 9).  The Examiner rejected the composition claim under section 35 U.S.C. § 112 and rejected the method claim under 35 U.S.C. § 101.  In rejecting the method claim, the Examiner stated:  "The treatment of leukemia is not a believable utility on it's [sic] face." (Ex. 9 at BARR_TEMO_023519). The Examiner then provided a generalized discussion of utility and indicated that the PTO used Guidelines set forth

in the Manual of Patent Examining Procedure ("MPEP") to evaluate utility in pharmaceutical patents. The Applicants never responded to the Examiner's Office Action, either by providing the clarification of utility that the Examiner sought, making arguments supporting the issuance of the patent, submitting data that supported the utility of the patents[6] or amending their claims. Instead, the Applicants requested an extension of time and then filed a continuation application (the '635 application) that was identical to the '656 application and abandoned the '656 application. (Ex. 10).

From March 6, 1984 to October 18, 1991, the Applicants repeated this pattern nine times (the '635, '462, '365, '397, '716, '473, '515, '614, and '221 applications). That is, the Applicants received an Office Action identical in all material respects to the first Office Action, did not respond to the Office Action, filed a continuation application identical to the first filed application and then abandoned the previous application.

On October 18, 1991, the Applicants filed their eleventh application, a continuation-in-part application (the '020 application). (Ex. 11). In this application, the Applicants amended the specification and added claims directed to a method of treating malignant gliomas and mycosis fungoides. This application was filed by lawyers for Plaintiff CRCT, less than 6 months after entering into a licensing agreement with May & Baker whereby CRCT obtained rights to the patent at issue. In return, CRCT would pay May & Baker a royalty based on the commercial development of any claimed compound. (Ex. 12). In filing the application, the Applicants submitted brief Remarks in which they argued that their application was allowable because the specification evidenced utility of the claimed compounds. (Ex. 11 at BARR_TEMO_022648). Despite Plaintiffs' claims in this litigation that Applicants believed that they needed evidence of

---

[6] Throughout the prosecution of the '291 patent, Applicants had animal data and human data showing that certain compounds claimed in their patent had anti-neoplastic activity and evidence that other compounds did not have such activity. Applicants did not present any of that data to the PTO during the prosecution of the '291 patent.

successful human clinical data to overcome the Examiner's Office Actions for the preceding 9 years, the Applicants did not provide human data or even argue that it was necessary. On August 6, 1992 the Examiner issued an Office Action identical in substance to the earlier Office Actions. (Ex. 13).  On February 5, 1993, for the first time in the nearly 11-year history of the prosecution, the Applicants finally filed a substantive Response to an Office Action, again arguing that the specification was sufficient.  (Ex. 14).  Not coincidentally, eight months prior, Applicants, through CRCT, had entered into a licensing agreement with Schering whereby Schering agreed to take a license to the intellectual property rights, data, and materials relating to temozolomide. (Ex. 15).  The February 5, 1993 response was made by lawyers for Plaintiff Schering.  In that response, the Applicants overcame the rejection, *inter alia*, by arguing that the conclusory statements about anti-neoplastic activity in the specification (which had been there since 1982) were sufficient to support utility.  (Ex. 14).

On April 16, 1993, following this single response, the Examiner allowed the claims in the '020 application.  (Ex. 7).  In doing so, the Examiner commented in the Notice of Allowance that his decision to allow the claims was supported by an article, Lunt et al, "Antitumor Imidazotetrazines.  14.  Synthesis and Antitumor Activity of 6- and 8-Substituted Imidazo[5,1-d]-1,2,3,5-tetrazinones and 8-Substituted Pyrazolo[5,1-*d*]-1,2,3,5-tetrazinones."  (Ex 7 at BARR_TEMO_022786-95).  That article, by two of the '291 patent inventors, contained detailed animal data showing the anti-neoplastic activity of some of the compounds covered by the '291 patent.  The Lunt article was published in 1987 and the Applicants had the data disclosed in the Lunt article by 1982.  The Applicants never disclosed the data or the Lunt article to the PTO during the 11-year prosecution.  The '291 patent issued on November 9, 1993, over 11 years after the first application was filed.  (Ex. 16).

## II.   Dr. Linck's Expert Report and Proffered Testimony

To assist the Court in determining whether Applicants' years of delay in prosecuting the

'291 patent were unreasonable and unexplained, Barr intends to offer Dr. Linck to testify as to:

- whether it is common practice to repeatedly file and abandon a patent application without submitting a response to Office Actions. (Ex. 2 ¶ 150).

- the many options that were available to the Applicants to move the prosecution forward, including (1) calling the Examiners, (2) requesting interviews with the Examiners, (3) arguing cases to the Examiner, (4) submitting a written response to the Office Actions, (5) submitting a declaration by someone of ordinary skill in the art stating that one of ordinary skill in the art would recognize the utility of the claimed compounds in humans and would have known how to make and use them based on the teachings in the application, (6) submitting available animal data, (7) submitting available human data, (8) addressing the Examiner's *objections* to claims, (9) addressing the examiner's best mode, written description, or enablement rejections; (10) arguing that the disclosed use for treating a skin graft was a sufficient utility, or (11) appealing the Examiner's decision to the Board of Appeals. (*E.g.*, Ex. 2 ¶¶ 146, 150, 164, 167, 170-172, 174-190; Linck Dep. Tr. at 78-80 (Ex. 17)).

- the consequence of not pursuing any of the many options designed to advance prosecution of an application (*i.e.*, the '291 patent likely would have issued much earlier had the Applicants responded to the Office Actions in a manner similar to the way that they responded in 1993 – by making arguments). (*E.g.*, Ex. 2 ¶¶ 144, 146).

- whether the nature and length of the prosecution of the '291 patent was typical for patents in the anti-cancer field by evaluating similar patents with anti-cancer utilities, all of which were assigned to the same examiners who examined the '291 patent applications during the same time period, all of which received identical or substantially similar grounds for rejection as that faced by the '291 Applicants, and all of which issued in a much shorter period of time. (Ex. 2 ¶¶ 192-217).

- how the prosecution of the '291 patent, where the 17-year patent term runs from issuance, compared to the prosecution of Applicants' numerous foreign patents, filed in jurisdictions in which the patent term ran from the filing date and were granted years before the '291 patent issued. (Ex. 2 ¶¶ 225-226).

Additionally, Barr intends to offer Dr. Linck's testimony to rebut the opinions of

Plaintiffs' expert, Mr. Wiseman. Mr. Wiseman intends to testify that the '291 patent Examiners

demanded Applicants provide evidence of "successful human clinical data"[7] to obtain allowance of their claims.   He also intends to testify that the PTO had an "evolving approach"[8] to examining anti-cancer claims between 1982 and 1993 that would have conveyed to Applicants that animal data would not have been  sufficient to support utility and they would need evidence of successful human clinical data.  (*E.g.*, Ex. 2 ¶¶ 163-65, 169; Ex. 17 at 175-80).  According to Mr. Wiseman, it was reasonable for Plaintiffs to delay while awaiting successful human clinical data to support the application.  (Ex. 4 ¶¶ 34, 50; Wiseman Dep. Tr. at 335 (Ex. 18)).  Dr. Linck directly contradicts Mr. Wiseman as to what the '291 patent Examiners requested and as to the policy of the PTO at that time.

## ARGUMENT

**I.      Dr. Linck's Expert Report and Testimony Do Not Run Afoul of This Court's Guidelines.**

Barr's proffer of Dr. Linck fully complies with the Guidelines set forth by this Court for expert testimony in patent cases.  Those Guidelines provide that:

> [i]n all patent jury trials, the court shows the video 'An Introduction to the Patent System' … [that] provides jurors with an overview of patent rights in the United States, patent office procedure and the contents of a patent.  Thus, expert testimony from attorneys regarding patent practice and procedure is not required and will not be permitted except in the case of extraordinary circumstances.
>
> 'Expert' legal testimony … on such substantive issues as invalidity (by anticipation, obviousness, on-sale bar, prior conception, etc.) and claim construction and infringement, generally is not admitted,

---

[7] Based on Plaintiffs' filings and expert reports in this case, Barr anticipates that Plaintiffs will argue at trial that "the Patent Office repeatedly rejected the claims [of the '291 patent], citing MPEP provisions and other authorities providing that successful human clinical data was necessary to satisfy the utility requirement of 35 U.S.C. § 101." (Pltfs. Br. at 11).  Plaintiffs' expert Mr. Adelman also repeatedly asserts that the Examiners required "successful human clinical data" and that "applicants diligently pursued such data during that time." (*See, e.g.*, Ex. 3 ¶¶ 13, 27, 34, 37, 40, 43, 48, 52, 72, 78-79).

[8] Plaintiffs assert that they "will show that, between the time the first application was filed in 1982 and up until the '291 patent issued in November 1993, the USPTO's approach to anti-cancer claims was evolving." (Pltfs. Br. at 11).

as descriptions of the law and instructions on the law are matters
for the court.

Dr. Linck's testimony does not run afoul of these Guidelines for several reasons: (1) this
bench trial will present extraordinary circumstances where the entire defense is based on the
manner in which the Plaintiffs conducted their prosecution of the '291 patent; (2) Dr. Linck will
not provide legal opinions concerning prosecution laches; and (3) Dr. Linck's testimony is in
part responsive to expert testimony that Plaintiffs concede is within the Guidelines.

### A.   Because of the Nature of Prosecution Laches, This Case Presents Extraordinary Circumstances and the Proffered Testimony Extends Beyond Introductory PTO Practice and Procedure.

As set forth in the Guidelines, this Court does not have a *per se* ban on patent expert
testimony. Rather, the Guidelines contemplate that such testimony may be necessary in
"exceptional circumstances." The prosecution laches in this case creates such an exceptional
circumstance.

By its nature, a prosecution laches defense requires that the Court evaluate the patentee's
conduct before the PTO to determine whether the patentee unreasonably delayed in prosecuting
the application. Among the factors the Court will be called on to evaluate are (1) whether the
prosecution history of Plaintiff's patents was typical of patents in that field of patents
generally; (2) whether Plaintiff took any unusual steps to speed or delay the application
process; (3) whether any changes in Plaintiff's prosecution of the application coincide with or
directly follow evolutions in the field that relate to the claimed invention; and (4) whether
legitimate grounds can be identified for the abandonment of prior applications. *See Reiffin v.
Microsoft Corp.*, 270 F. Supp. 2d 1132, 1155 (N.D. Cal. 2003) (setting forth relevant factors
for consideration in determining the "reasonableness" of patent prosecution). Analysis of the

factual context of these prosecution laches factors goes beyond an introduction to PTO practice and procedure.

Unlike defenses such as anticipation and prior conception, prosecution laches is an area of the law where the entire issue is the strategy and tactics used by the applicant in the prosecution of the application before the PTO.  Indeed, prosecution laches is a unique defense in which a prosecution expert can provide valuable insight.  This Court recognized the uniqueness of the defense when it allowed expert testimony[9] with respect to prosecution laches in *Intuitive Surgical, Inc. v. Computer Motion, Inc.*, C.A. No. 01-203-SLR (D. Del. July 30, 2002) (Ex. 1).

In this case, the Court's assessment of whether filing and abandoning applications for more than 9 years was reasonable will require an understanding of the options available to the Applicants, the effect of doing what they did, whether others in the field at this time acted in a similar fashion, and the length of time of prosecution of similar patents.  As detailed above, Dr. Linck's expected testimony will provide insight into the universe of options that were available to the '291 patent Applicants when faced with the Examiner's objection or rejection, which are not apparent from the face of the prosecution history.  Such testimony is relevant to the inquiry as to whether the PTO or Applicants took any unusual steps to delay the application process. *Reiffin*, 270 F. Supp. 2d at 1155.  On that point, Dr. Linck will testify that she has never seen a prosecution like this one:  11 years of applications where for more than 9 of those 11 years the applications were re-filed and abandoned 10 times with no substantive response to the Examiner's Office Actions.  (Ex. 2 ¶ 150).  She will explain what the Applicants could have done in order to move the application forward, (Ex. 2 ¶¶ 146, 150, 164, 167, 170-172, 174-190;

---

[9] Although that case was a jury trial, the Court bifurcated the trial and heard the prosecution laches expert testimony during the bench trial portion.  Here, there is only a bench, not jury, trial.

Ex. 17 at 78-80), and whether such actions have been successful in similar prosecutions, (Ex. 2 ¶¶ 192-217).

Dr. Linck's testimony will provide context for the prosecution of the '291 patent by describing the prosecution of similar patents with anti-cancer utilities that were assigned to the same examiners who examined the '291 patent applications during the same time period. (Ex. 2 ¶¶ 192-217). Such testimony can help to shed light on whether the prosecution history of the '291 patent was "typical of patents in that field of patents generally" – a "[c]onsideration[] relevant to the determination of prosecution laches." *Reiffin*, 270 F. Supp. 2d at 1155; *see also Hynix Semiconductor, Inc. v. Rambus, Inc.*, 2007 WL 4209386, at *3 (N.D. Cal. Nov. 26 2007) (citing a patent law expert's report in a prosecution laches case for the proposition that the evidence "suggests that the patents-in-suit took longer to issue than 99.9% of similar patents").

Based on her extensive background both filing and evaluating applications, Dr. Linck can also provide insight about the presentation of data to the PTO, what was typically deemed data sufficient to show utility, and, as to the prosecution in suit, when that data was available and could have been submitted to the PTO. (Ex. 2 ¶¶ 170-79). Plaintiffs state that the initial application included "a detailed summary of animal test data." (Pltfs. Br. at 10-11). Particularly given her Ph.D. in chemistry and experience in the pharmaceutical industry as a chemist, executive, and prosecuting attorney, Dr. Linck can assist the Court in understanding the importance of the animal model information disclosed in the patent and the significance of other animal and human data available to the Applicants throughout the '291 patent prosecution.

In addition, Dr. Linck's expected testimony will respond to the Plaintiffs' expert testimony that the '291 patent examiners required "successful human clinical data" to satisfy the utility requirement for the '291 patent and that the PTO purportedly had an "evolving approach"

13

to utility for anti-cancer claims. (Ex. 3; Ex. 4). Dr. Linck can provide useful factual context and analysis on this issue, particularly given her experience as the Solicitor at the PTO, where she examined the historical standard for utility, assessed whether there was a change in that standard, participated in public hearings on the utility issue in the biotechnology industry, and drafted the 1995 utility guidelines. (Ex. 17 at 38-39).

The proffered areas of testimony are not an introduction to PTO practice and procedure. Instead, the proffered expert testimony delves into the specifics of what transpired during a particular prosecution to assist the Court to assess the reasonableness of that prosecution. Accordingly, because of the unique nature of the prosecution laches defense and the extraordinary circumstances of this case, including Plaintiffs' response to that defense, Dr. Linck's testimony should be allowed.

**B.      The Proffered Testimony Will Not Constitute Legal Testimony That Invades the Province of the Court and It Is Not Legal Advocacy.**

In accordance with the Guidelines, Barr does not intend to offer legal testimony. For instance, Dr. Linck will not tell the Court what is and is not prosecution laches. To the contrary, Dr. Linck will address considerations relevant to the determination of prosecution laches. As detailed above, those considerations include the options available to prosecuting attorneys given the Office Action received, the duration and prosecutions of analogous patents, whether the PTO had an "evolving approach" to utility for anti-cancer claims and whether the Examiners required successful human clinical data during the prosecution. None of those matters is legal testimony that invades the province of this Court.

To the extent that Plaintiffs argue that Dr. Linck's testimony is "lawyer argument," (Pltfs. Br. at 9), they do so by highlighting a select few lines of deposition testimony, not Dr. Linck's expert report. The deposition was taken by Plaintiffs' counsel and, as was her obligation, Dr.

14

Linck answered all non-privileged questions, whether or not those questions would be put to her at trial. In their questioning, Plaintiffs undoubtedly sought sound bytes to use in support of this motion. These isolated deposition quotes are not indicative of the testimony to be offered at trial.

In addition, the excerpts are taken almost comically out of context. For example, while quoting Dr. Linck as stating, "I believe that I have the background to make the call as to what was objectively reasonable in this situation," (Pltfs. Br. at 9), Plaintiffs fail to quote the question to which Dr. Linck was responding – "And you get to determine what's reasonable here, right?" (Ex. 17 at 157) – or the remainder of Dr. Linck's answer:

> Of course, the judge will ultimately decide what's reasonable and what's not reasonable. Sorry. I just didn't quite finish my answer.

(Ex. 17 at 158).

## II.     Dr. Linck's Proffered Testimony Will Assist the Court, Consistent with Federal Rule of Evidence 702 and the Rulings in Other Prosecution Laches Cases.

Plaintiffs' assertion that Dr. Linck's testimony should be excluded under Federal Rule of Evidence 702 also is without merit. Rule 702 allows for expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." Fed. R. Evid. 702. In other words, such testimony is permissible if it is helpful to the Court. As set forth above, on the issue of prosecution laches, Dr. Linck's testimony will aid the Court in the evaluation of Applicants' choices, strategies and tactics before the PTO. In any event, Plaintiffs' designation of Mr. Wiseman to offer testimony concerning their "evolving approach to anti-cancer utility" theory, to which Dr. Linck responds directly, contradicts their contention that Dr. Linck's testimony is improper.

Plaintiffs' blanket assertion that "attorney expert testimony" is inadmissible is simply incorrect. (Pltfs. Br. at 7). Numerous courts, including this Court, have allowed focused testimony from "attorney experts," and the Federal Circuit has acknowledged the admissibility of

such testimony. *See, e.g., Sundance Inc. v. DeMonte Fabricating, Inc.*, 550 F.3d 1356, 1363 n. 5 (Fed. Cir. 2008) ("patent lawyers might offer testimony in contexts other than noninfringement and invalidity, such as patent office practice and procedure"); *Tafas v. Dudas*, 511 F. Supp. 2d 652, 661 (E.D. Va. 2007) ("patent lawyers frequently testify as expert witnesses as to matters of PTO practice and procedure"). Particularly in prosecution laches cases, experts offering testimony similar to that of Dr. Linck have been permitted to testify. *Hynix*, 2007 WL 4209386, at *5 (expert testimony as to the length of prosecution "especially compared to similar patents" is relevant for a prosecution laches analysis; "the court will not be prejudiced, nor have its 'province invaded' if Mr. Mossinghoff's testimony touches on the substance of the patent law and prosecution laches in pointing out areas of delay"). Indeed, counsel for Plaintiffs in this case presented the testimony of a law professor with no PTO experience whatsoever, Mr. Adelman, to testify in another prosecution laches case. *See Symbol Technologies, Inc. v. Lemelson*, 301 F. Supp. 2d 1147 (D. Nev. 2004).

None of the cases cited by Plaintiffs involves a prosecution laches defense. (Pltfs. Br. at 3 n. 2). *E.g., F. Hoffmann-LaRoche, Ltd. v. IGEN Int'l, Inc.*, C.A. No. 98-318-JJF (D. Del. Oct. 24, 2000) (plaintiff proffered patent attorney to testify on the issue of willfulness) (Pltfs. Br. at Ex. 7); *Boehringer Ingelheim Int'l GMBH v. Barr Labs., Inc.*, C.A. No. 05-700-JJF (D. Del. Feb. 7, 2008) (defendant proffered patent attorney in relation to its double-patenting defense) (Pltfs. Br. at Ex. 11).

Plaintiffs assert that Barr knows that Dr. Linck's "testimony is improper given that Judge Farnan recently ruled against Barr on that very issue, in Boehringer Ingelheim...." (Pltfs. Br. at 3-4). That, of course, is entirely untrue: *Boehringer* is a very different case from the one at issue here. *Boehringer* was a double patenting case where the court concluded that the prosecution

history was very simple, (Pltfs. Br. at Ex. 11, p. 18) (the attorney opposing the expert's testimony argued, "It's not complicated at all...[t]hese are easy filed [sic] histories."), and that the only thing that the legal expert would do is walk through the file history, (*Id.* at 17).   The Court precluded the expert's "testimony because it is the proffer that it's a walk-through." (*Id.* at 21). That is not the case here.

The other cases cited by Plaintiffs actually support the proposition that testimony from a patent prosecution expert such as Dr. Linck can be helpful under certain circumstances.   In *Thorn EMI N. Am. Inc. v. Micron Tech., Inc.*, C.A. No. 92-673-RRM (D. Del. Nov. 23, 1993) (Pltfs. Br. at Ex. 10), and *Lucas Aerospace v. Unison Indus., L.P.*, C.A. No. 93-525-JJF (D. Del. Mar. 9, 1995) (Pltfs. Br. at Ex. 9), the courts found permissible expert testimony related to patent office practice and procedure to, *inter alia*, provide context for the events in the file history. *See also Berg Elec., Inc. v. Molex, Inc.*, C.A. No. 94-470-RRM (D. Del. Sept. 26, 1995) (disallowing a patent attorney from testifying before the jury regarding the duty of disclosure, but noting that expert testimony would have been permissible to help the jury to understand the file wrapper) (Pltfs. Br. at Ex. 8).   In addition, each case cited by Plaintiffs involved a jury trial, which raised an issue not present here:  the possibility of a "legal expert" other than the judge instructing the jury as to the law.

Pursuant to Rule 702, Dr. Linck's testimony therefore will assist the Court in considering the factors relevant to Barr's prosecution laches defense and in evaluating Plaintiffs' asserted explanations for the long duration, repeated abandonments, and refiling of continuation applications in the '291 patent prosecution.

III.    **Dr. Linck Is Eminently Qualified to Provide Testimony in This Case.**

Plaintiffs do not appear to contest Dr. Linck's qualifications as an expert if the Court allows her testimony as to the specifics of this prosecution history, the options available to the Applicants at various points in that history, and comparisons with the prosecutions of analogous patents. Rather, Plaintiffs only appear to dispute her qualifications to rebut Plaintiffs' expert's testimony on the specific topic of whether the PTO actually changed its approach to the utility requirement for anti-cancer claims during the pendency of the '291 patent prosecution.

A.    **Dr. Linck's Knowledge and Experience Qualify Her Under Rule 702 to Testify As to the Prosecution of Patents, Including the Specifics of the PTO Policy on the Utility Requirement.**

Rule 702 allows for expert testimony by a "witness qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Plaintiffs' assertion that Dr. Linck "lacks critical qualifications" because "she never worked as a Patent Examiner," (Pltfs. Br. at 10, 12), is not supported by the plain language of Rule 702 or by caselaw.

Dr. Linck is eminently qualified to testify about the prosecution of patents. For over 25 years, Dr. Linck has had extensive first-hand experience with the PTO: as a prosecuting attorney beginning in 1984, as the Solicitor of Patents and Trademarks for the PTO from August 1994 until November 1998, as an Administrative Patent Judge between 2006 and 2008, and as a member of various committees of the AIPLA, which interacted with the PTO on a regular basis regarding examination issues beginning in 1986. (Ex. 17 at 82). Even Plaintiffs agree that she "has had a long and notable career in patent law." (Pltfs. Br. at 1).

With respect to her testimony as to Plaintiffs' assertion that the PTO had an "evolving approach" to examining anti-cancer claims, Dr. Linck has a unique, comprehensive understanding of the PTO's approach to utility. Specifically, as Solicitor of Patents and Trademarks for the PTO, Dr. Linck undertook an in-depth review and analysis of the PTO's

utility guidelines.   She participated in hearings with the PTO Commissioner regarding utility issues faced by members of the biotechnology community, attended meetings with various Art Groups, directors, and individuals at the PTO, considered public comments to the draft utility guidelines, and reviewed and analyzed associate solicitors' legal research and analysis relating to the guidelines.  (Ex. 17 at 38-39).  And she ultimately was one of the authors of the PTO's new Utility Examination Guidelines that issued in 1995, in response to concerns raised by the biotechnology sector.   (Ex. 17 at 89-90).  As Dr. Linck testified:

> [I was] the chief legal officer for the [PTO] at the time when in fact utility was raised as an issue.  When I was required to actually investigate what was going on in the Office and understand the background, I was one of the authors of the utility guidelines.  And, in fact, the guidelines are legal guidelines and were the responsibility of my office.

(Ex. 17 at 89-90).  She is thus eminently qualified to discuss the PTO's approach to the utility requirement at all times relevant to this case.

Notwithstanding Plaintiffs' attempt to make light of some of Dr. Linck's experience with the PTO because she served the office for "love of the practice of patent law" rather than for pay, (Pltfs. Br. at 12), there is nothing in Rule 702 that requires a proposed expert's "experience" to have been compensated.  And, as the Federal Circuit has noted, there is "no basis for carving out a special rule as to experts in patent cases." *Sundance*, 550 F.3d at 1360.

Plaintiffs have not cited a single case that holds that an expert must have been an Examiner in order to be qualified to opine on patent prosecution.  Indeed, another District Court within the Third Circuit permitted the testimony of a proffered expert in PTO practice and procedure who was not employed by the PTO during the relevant time period.  *Daiichi Pharm. Co. v. Apotex, Inc.*, No. 03-CV-937 (WGB), 2005 U.S. Dist. LEXIS 26062, *4 (D. N.J. Nov. 1, 2005) ("It is not necessary that [the expert] have worked at the PTO during a specific time frame

to opine on PTO practice and procedure.  The Court finds no support for this contention.") (Ex. 19).

Moreover, Dr. Linck is significantly more qualified than either of Plaintiffs' proposed patent experts to opine on this issue.  While Mr. Wiseman was an Examiner during the 1980s, (Pltfs. Br. at 14 n. 5), Examiners typically focus on the individual cases on his or her own docket, rather than the broader, historical scope of PTO policy.  (Ex. 17 at 101, 299).  And it appears that the applications on Mr. Wiseman's docket predominantly were in the area of biotechnology rather than the chemical arts, which is the subject of the '291 patent.  (Ex. 20 at CRT_SCH00259202; Ex. 4 at Ex. B).  Mr. Adelman's only experience prosecuting patents took place in the late 1960s and early 1970s, when he prosecuted less than 20 applications, none of which was in the pharmaceutical area.  (Ex. 5 at 9-10).  He has had no unique knowledge about the PTO's utility requirement, and he has never worked for the PTO in any capacity – not as an Examiner and not as Solicitor.  (Ex. 5 at 11).  Accordingly, Dr. Linck is in a far better position than either of Plaintiffs' experts to opine on the PTO's utility policies between 1982 and 1993.

**B.     Plaintiffs' Criticisms of Dr. Linck Constitute a Disagreement with the Substance of Her Opinions and Not Her Qualifications.**

Most of the section of Plaintiffs' brief that questions Dr. Linck's qualifications simply takes issue with her opinions and not her qualifications to form them.  Plaintiffs question Dr. Linck because she does not accept their expert's opinion that the '291 Examiners required successful human clinical data and that the PTO had an "evolving approach" to examining anti-cancer claims.  The proper subject matter of this motion is whether Dr. Linck is qualified to offer an opinion, not the substance of that opinion.  Nevertheless, Plaintiffs simply are wrong.

Specifically, in their brief, Plaintiffs assert that Dr. Linck's opinion that the '291 patent Examiners *did not* require successful human clinical data is "demonstrably incorrect in view of

the plain words of the '291 prosecution history." (Pltfs. Br. at 11).   The "plain words" "successful human clinical data" were never used by the Examiners and the authorities cited by the Examiners, contrary to Plaintiffs' claims (Pltfs. Br. at 11), also do not state that successful human clinical data is required to support a patent application with anti-cancer claims.   Indeed, *In re Hartop et al.*, 311 F.2d 249, 135 USPQ 419 (CCPA 1962), cited by the Examiner, is cited in the MPEP for the proposition that where the "utility relied on is directed *solely* to the treatment of humans", "animal tests may be adequate where the art would accept these as appropriately correlated with human utility."   MPEP § 608.01(p) (5th ed. Aug. 1983) (Ex. 21). The *Hartop* court found that sufficient data on rabbits had been disclosed by the applicants to establish utility, even as to use on humans, and noted the distinction between the responsibilities of the PTO compared to other federal agencies (*e.g.*, the FDA).   311 F.2d at 257-60.   Similarly, in *In re Citron*, 325 F.2d 248, 139 USPQ 516, (CCPA 1963), also cited by the Examiners and cited in the MPEP, the court found that the anti-cancer claims were directed to "an apparently inoperative utility" because the specification did not "contain a single *specific* experiment, of which the details [were] supplied, wherein any animal was actually benefited by treatment with the claimed precipitate or serum."   139 USPQ at 520 ("The defect here is that in spite of the somewhat grandiose claims of appellant's specification, purportedly based on actual tests or experiments, not one iota of evidence has been produced tending even to show that tests were actually conducted.").

Plaintiffs dramatically claim to have "confront[ed]" Dr. Linck with *In re Brana*, 51 F.3d 1560 (Fed. Cir. 1995), to "challenge" her opinion that the PTO did not have an evolving approach to the utility requirement.   (Pltfs. Br. at 12).   While it is at the heart of Plaintiffs' expert

Mr. Wiseman's opinions, *Brana* actually supports Dr. Linck's opinions.[10]   Indeed, as Dr. Linck

pointed out during her deposition, the Federal Circuit expressed surprise in *In re Brana* that the

issue of what an applicant for a pharmaceutical patent must "prove regarding practical utility or

usefulness of the invention" was being raised because it "is not a new issue; it is one which we

would have thought would have been settled by case law years ago." *In re Brana*, 51 F.3d 1560,

1564 (Fed. Cir. 1995).   The Federal Circuit further stated that its "predecessor has determined

that proof of an alleged pharmaceutical property for a compound by statistically significant tests

with standard experimental animals is sufficient to establish utility" and cited two cases from the

early 1960s:  *In re Krimmel*, 292 F.2d 948, 953 (CCPA 1961) and *In re Bergel*, 292 F.2d 958

(CCPA 1961). *Brana*, 51 F.3d at 1567.

Plaintiffs also cite one isolated out-of-context passage from the "Comments of the

Biotech Industry Organization" to support their assertion that Dr. Linck's opinion that the PTO

did not have an evolving utility policy "cannot survive scrutiny under the Court's gatekeeper

function." (Pltfs. Br. at 13).  These "Comments" relate to October 1994 hearings held by the

PTO in which Dr. Link participated.  The hearings resulted from complaints from biotechnology

community members in the early 1990s, not from the pharmaceutical community seeking patents

for chemical compounds.  The biotechnology community believed that the newly formed PTO

biotechnology art group (Group 1800) applied the utility requirement non-uniformly and too

strictly.  (Ex. 17 at 38-39, 236).  Plaintiffs do not cite additional passages from transcripts of the

October 1994 hearings that clearly demonstrate that the concerns about the utility requirement

---

[10] Plaintiffs state that Dr. Linck called *Brana* an "outlier," (Pltfs. Br. at 12), without clarifying that Dr. Linck was referring to the PTO's handling of the examination of Brana's patent application and his appeal – not the Federal Circuit's decision in that case.

were primarily in the biotechnology industry[11] and first arose in 1990, when the new art group

was formed and staffed with dozens of new PTO Examiners (Ex. 17 at 150-51) – after the

applications leading to the '291 patent had been pending for 8 years.  For example:

> Very recently, with regard in particular to patents in 'biotechnology,' we
> feel there has been a substantial change in the practice of the U.S. Patent
> and Trademark Office.  Demands for definitive proof of therapeutic utility
> (which I remind you can truly only come after a drug has been marked for
> 2-3 years to assure that it is safe with broad use) have resulted in many
> patent application rejections. . . . So what am I recommending? . . . Treat
> patents from so-called biotechnology companies and pharmaceutical
> companies equally.  We are the same industry with the same customers,
> practicing similar science.  (Ex. 20 at CRT__SCH00259265-66).

Indeed, during those hearings, the PTO's then-Commissioner, Bruce Lehman, was asked

point-blank whether the PTO, beginning in 1990, had changed its standards with respect to utility

(*i.e.*, now requiring evidence of human clinical data).  (Ex. 20 at CRT__SCH00259233).  He

responded that there had been no change in PTO policy.  (Ex. 20 at CRT_SCH00259234).

Specifically, he explained that if there appeared to be a recent requirement for human data to

support biotechnology patents, it was because biotechnology was a new area and the PTO had

recently hired many new Examiners unfamiliar with patent examining procedures.  (Ex. 20 at

CRT__SCH00259234) ("now over half of our examiners in [the biotechnology group] are Ph.D.s

[and] I think that initially . . . there may have been a tendency to look at their work as peer

review rather than as patent examining").

In the end, the prosecution history of this patent and others presented by Dr. Linck belies

Plaintiffs' claims of a PTO "policy" in effect from 1982 to 1993 that required applicants to

provide evidence of successful human clinical data to support utility, and Plaintiffs' argument

---

[11] As one member of the biotechnology community stated at the hearings, "[r]ecent actions by the Patent and Trademark Office have suggested that biotechnology is almost placed in the same 'weird science' category as cold fusion and perpetual motion." (Ex. 20 at CRT_SCH00259270).

that the Examiners demanded that the '291 Applicants provide such data. Rather, neither the '291 Applicants nor others faced with similar rejections ever submitted human clinical data to obtain issuance of their patents. (Ex. 2 at ¶¶ 192-217). Indeed, when the '291 Applicants finally made their first substantive response to the PTO's Office Action in 1993, they made arguments that the specification was sufficient, which did not have any human clinical data in it. (Ex. 14). The Examiner allowed the patent immediately thereafter. (Ex. 7).

Accordingly, Plaintiffs' criticisms of Dr. Linck's qualifications are without merit. The fact that Plaintiffs have found an expert to contradict Dr. Linck does not make her unqualified to testify.

## IV.      Plaintiffs' Request for Drastic Relief Is Unwarranted.

Plaintiffs ask that Dr. Linck's report be stricken in its entirety and her testimony at trial be excluded.[12]   However, courts have found excluding an expert's entire report to be "an extraordinary measure" and chastised parties moving to strike a report without identifying "specific portions of the report that it contends should be stricken." *Chamberlain Group, Inc. v. Interlogix, Inc.*, No. 01 C 6157, 2002 WL 653893 at *1 (N.D. Ill. April 19, 2002); *Tafas*, 511 F. Supp. 2d at 661-62 (declining to strike the entire report particularly given the expert's "obvious qualifications in the field and clear ability to explain the complexities of patent regulation and the background of this matter").

This is particularly true here, where Dr. Linck's report and proposed testimony in large part consists of rebuttal to Plaintiffs' theory (as disclosed in Plaintiffs' filings and discovery responses) and testimony offered by Plaintiffs' expert Mr. Wiseman. Plaintiffs contend, as they

---

[12] Plaintiffs further argue that Dr. Linck's supplemental expert report should be stricken. (Pltfs. Br. at 14-15 n. 6). This argument is without merit. Dr. Linck's supplemental report complies with Federal Rule of Civil Procedure 26 which provides: "For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition." Plaintiffs' argument also is undermined by the fact that they served their own supplemental reports (of their experts Dr. Jeffrey Raizer and Dr. Victor Levin) days ago, on February 20, 2009. (D.I. 149).

must, that an "appropriate subject of expert testimony in this case is the USPTO's evolving approach to anti-cancer claims in the 1980s and early 1990s," because Mr. Wiseman, also a lawyer, will be testifying to precisely that subject matter.[13]   (Pltfs. Br. at 10).   At a bare minimum, Dr. Linck should be permitted to respond to Mr. Wiseman's "evolving approach" to utility opinion.   There is no principled basis for permitting the testimony of Plaintiffs' legal expert on that topic while excluding Dr. Linck.

## V.   Plaintiffs Are Not Entitled to Costs.

Plaintiffs' assertion that Barr should be responsible for "all costs and fees" incurred by Plaintiffs in connection with their preparation of responsive expert reports, "all depositions relating to" Dr. Linck's report, and their motions to strike Dr. Linck's report and preclude her from testifying at trial is ludicrous. (Pltfs. Br. at 14).

First, Barr has in good faith relied on other cases where patent prosecution experts were admitted to discuss factual considerations relevant to prosecution laches, including this Court's *Intuitive Surgical* decision.

Second, as previously noted, Plaintiffs contend that they will call Mr. Wiseman on certain subjects whether or not Dr. Linck testifies.   Plaintiffs therefore did not incur the expense of preparing a report for Mr. Wiseman because Barr offered the Linck Report.   Those expenses would have been incurred in any event. (Pltfs. Br. at 14 n. 5).   Similarly, Plaintiffs indicated in the Adelman Report that only parts of Adelman's testimony were conditioned upon the Court permitting Dr. Linck's testimony.   In other words, Plaintiffs prepared the Adelman Report with the intention of presenting Mr. Adelman's testimony whether or not Barr presented the Linck

---

[13] While Plaintiffs state that some areas covered in Wiseman's Report will be offered only if Plaintiffs' motion to exclude Dr. Linck fails, Plaintiffs contend that Wiseman's proposed testimony concerning the "evolving approach" utility argument and the alleged PTO policy on utility is proper testimony and will be offered irrespective of the Court's decision on this motion. (Pltfs. Br. at 14 n. 5).

Report.[14] (Ex. 3, pp. 1-2). Accordingly, even if this Court were to grant this motion, an award of fees or costs is not appropriate.

Finally, the Court's December 18, 2008 Order says *nothing* about costs relating to preparation of expert reports or depositions. Rather, it is limited to the possibility of "costs of the motion practice." Plaintiffs had a choice to make: either challenge the admissibility of Dr. Linck's testimony through motion practice *or* retain their own expert to respond to Dr. Linck. Barr should not be held responsible for Plaintiffs' choice of action. If Plaintiffs truly believed that Dr. Linck's report was impermissible, Plaintiffs could have stood by their convictions and challenged the admissibility of Dr. Linck's testimony through motion practice. Instead, Plaintiffs engaged not one *but two* experts (Messrs. Adelman and Wiseman) to respond to Dr. Linck – inflating their costs and wasting Barr's time at the unnecessary deposition of Mr. Adelman, particularly given that he testified that he had nothing to add to the case that will assist the Court. (Ex. 5 at 241).

## CONCLUSION

Plaintiffs' motion to strike Dr. Linck's report and preclude her from testifying at trial should be denied.

Respectfully submitted,

PHILLIPS, GOLDMAN & SPENCE, P.A.

By: *Buey S Farnan*
John C. Phillips, Jr. (#110)
Brian E. Farnan (#4089)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
(302) 655-4210 (fax)
jcp@pgslaw.com

---

[14] It was not until Mr. Adelman's deposition that Plaintiffs' counsel for the first time designated his testimony as entirely conditional. (Ex. 5 at 7-8).

and

George C. Lombardi (admitted *pro hac vice*)
Taras A. Gracey (admitted *pro hac vice*)
Lynn M. Ulrich (admitted *pro hac vice*)
Ivan M. Poullaos (admitted *pro hac vice*)
Julie Mano Johnson (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tele: (312) 558-5600
Fax: (312) 558-5700

Attorneys for Defendants

Dated: February 23, 2009