# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CANCER RESEARCH,<br>TECHNOLOGY LIMITED and<br>SCHERING CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>BARR LABORATORIES, INC. and<br>BARR PHARMACEUTICALS, INC.,<br><br>Defendants. | Civil Action No. 07-457 (SLR) |

## EXPERT REPORT OF PROFESSOR MARTIN J. ADELMAN

    I, MARTIN J. ADELMAN, have been retained by Ropes & Gray LLP as an expert in this case on behalf of plaintiffs Cancer Research Technology Limited ("CRT") and Schering Corporation ("Schering") (collectively "Plaintiffs"). I submit this report in rebuttal to the opinions advanced in the "revised" opening report of Nancy J. Linck, Esq., Ph.D. ("Linck Report"), regarding the prosecution of United States Patent 5,260,291 ("the '291 patent"), which I understand was submitted by counsel for Barr on December 24, 2008.

    I understand that counsel for Plaintiffs in this case have already expressed their view that several areas of Ms. Linck's report exceed the scope of the Court's Guidelines for expert testimony on Patent Office practices and procedures. I offer rebuttal of Ms. Linck's opinions in those areas conditionally, should she be permitted to testify.

I also understand that counsel for Plaintiffs have advised the Court of their belief that expert testimony directed to the Patent Office's evolving policies concerning anti-cancer claims in the 1980s and early 1990s is appropriate in this case and will be helpful to the Court as the finder of fact.  I offer my opinions on that issue herein.

If asked by the Court or by counsel for either party, I expect to testify at trial regarding the matters discussed in my report.

## I.   BACKGROUND AND QUALIFICATIONS

1.   I am the Theodore and James Pedas Family Professor of Intellectual Property and Technology Law, Co-Director of the Intellectual Property Law Program, and Co-Director of the Dean Dinwoodey Center for Intellectual Property Studies at The George Washington University Law School.

2.   I received my law degree in 1962 from the University of Michigan, where I was on the editorial board of the Michigan Law Review.  After graduating from law school, I served as a law clerk for Chief Judge Levin of the United States District Court for the Eastern District of Michigan.

3.   I also hold a bachelor's degree in medical science and a master's degree in physics, both from the University of Michigan.

4.   After my clerkship, I was an associate with the law firm of Honigman, Miller, Schwartz & Cohn in Detroit.  In 1964, I joined the patent department of the Burroughs Corporation in Washington, D.C.  After participating in Burroughs' training program and completing a year with the company, I became an associate in the patent firm of Barnard, McGlynn and Reising in Birmingham, Michigan.  I later became a partner with Barnard, McGlynn and Reising.  During the 1968-1972 period, I was the partner in charge of patent, patent-antitrust and related litigation.

3733943_2.DOC

5.      I was a full professor with Wayne State University Law School from 1973 until I retired from that position in 1999.  I taught courses (seminars) in patent law, advanced patent law, antitrust law, and law and economics.  I now hold the position of Professor Emeritus with Wayne State.

6.      From 1977-1988, I was one of the co-authors of a six-volume (now eight volumes) treatise on patent law and practice entitled Patent Law Perspectives (2d ed.), published by Matthew Bender.  Since 1988, I have been solely responsible for writing the quarterly release for each of the volumes.

7.      I have also written a number of articles on issues of patent law and practice, and have taught seminars on patent law and practice for United States District Judges and United States Magistrate Judges.  A copy of my curriculum vitae is attached as Exhibit A.

8.      My opinions are based on my 45 years of experience in the field of patent law and procedure, and upon the information I have considered.  This includes, but is not limited to, my study and review of the patents-in-suit and their prosecution histories, patent applications related to the patents-in-suit and their prosecution histories, and the information and documents identified in this report.  A list of the materials that I considered is attached as Exhibit B.

## II.     THE PROSECUTION OF THE APPLICATIONS RESULTING IN THE '291 PATENT

9.      In ¶ 40 of her report, Ms. Linck states that each of the first ten applications in the series of eleven applications that led to the '291 patent "was abandoned, without any effort made to advance prosecution, once another application was filed."  I disagree with Ms. Linck's characterization of the prosecution of the patent

applications that led to the '291 patent. The record shows that the applicants filed remarks in response to the Examiner's restriction requirement in U.S. patent application No. 06/410,656 ("the '656 application"). Moreover, the file histories show that the Examiners made repeated requests for successful human clinical data, and I am informed that the evidence shows that the applicants made diligent efforts to obtain that data.

### A.   U.S. patent application No. 06/410,656 ("the '656 application")

10.     On August 23, 1982, Ellsworth H. Mosher filed the '656 application, entitled Tetrazine Derivatives, on behalf of Edward Lunt, Malcolm Francis Graham Stevens, Robert Stone, and Kenneth Robert Harry Wooldridge and their assignee, May & Baker Limited. The '656 application claimed priority to British Patent Application No. 8125791, filed August 24, 1981. (CRT_SCH 00107877.) The '656 application included 29 claims.

11.     Examiner John M. Ford issued the first Office action in the '656 application on August 11, 1983. That action was a restriction requirement, requiring applicants to "elect and present a claim to the elected method of use." (CRT_SCH 00107892.)   Applicants responded on September 12, 1983 with an Amendment adding claims 30 and 31. (CRT_SCH 00107893-94.)

12.     On November 18, 1983, Examiner Ford withdrew claims 28-30 from consideration, rejected claims 27 and 31, and objected to claims 1-26. (CRT_SCH 00107895.) Ms. Linck devotes over two pages of her report to quoting the Office action. (Linck Report ¶ 51.) In quoting that Office Action, Ms. Linck employs an ellipsis and does not quote a portion of the Office action in which Examiner Ford discussed his request for proof of the invention's utility in humans:

*The District Court for the District of Columbia held the Patent Office should be careful and perhaps even reluctant to grant a patent on a medicinal composition until it has been thoroughly tested and tried by several physicians, on the theory that some members of the public would rely on the "official imprimatur" given to the medicinal by the granting of a patent thereon. Issenstead v. Watson, (DCDC 1957) 157 F Supp 7, 115 USPQ 408; Schindler v. Comr. of Pats. (DCDC 1967) 269 F Supp 630, 155 USPQ 838. Thus, where an application discloses a therapeutic effect on humans or a cure for a human disease as the utility of a claimed process, the District Court held that proof of such utility is required unless one of ordinary skill in the art would accept the utility statement as obviously valid and correct. Radoev v. Brenner, Ferguson, (POBA 1957) 117 USPQ 229.*

*Where utility is based on the alleged enhancement of activity of known medicinals, the CCPA upheld the Examiner's requirement that the applicant submit evidence which substantiated the allegation, the court holding such requirement proper where utility is based on that type of allegation, unless one skilled in the art would accept them as obviously valid and correct. In re Novak et al., (CCPA 1962) 306 F2d 924, 134 USPQ 335.*

The treatment of leukaemia is not a believable utility on it's face. Claim 31 is rejected under 35 USC 101.

The board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof, when such use is of a medical nature of for the treatment of a serious disease., such as cancer. Ex parte Moore et al., (POBA 1960) 128 USPQ 8; In re Citron, (CCPA 1964) 325 F2d 248, 139 USPQ 516; In re Hartop et al., (CCPA 1962) 311 F2d 249, 135 USPQ 419.

Remission of a specific leukaemia could be establish, but has not been so accomplished here or so claimed.

(CRT_SCH 00107899-901) (emphasis added showing paragraphs omitted by Ms. Linck).

13.    In ¶ 52 of her report, Ms. Linck states that "the Examiner did not reject compound claims 1-26 but merely objected to these claims 'pending clarification of utility,'" and she goes on to conclude that "the Examiner determined that claims 1-26 were allowable, subject to clarification of utility (which Applicants did not attempt to do)." I disagree with Ms. Linck's characterization of Examiner Ford's Office action. An

objection reflects the Examiner's judgment that a claim is not in a condition for allowance. Examiner Ford stated that he doubted that the claims had utility and asked for proof thereof. I understand that applicants diligently pursued such proof -- by way of human clinical trials -- throughout the pendency of the applications that led to the '291 patent.

14.    Ms. Linck goes on to state that "[a]pplicants did not respond to the Examiner's Office Action or even make an inquiry as to what he was seeking regarding clarification of utility." (Linck Report ¶ 54.) I do not believe this to be a fair characterization of the prosecution history. It is reasonable to conclude that the applicants properly understood that Examiner Ford was requesting clinical data to support their asserted utility. There was, therefore, no need for clarification -- rather, only a need to gather the necessary data, which, I have been informed, the evidence shows applicants diligently pursued.

15.    In ¶ 55 of her report, Ms. Linck also asserts that during the prosecution of the '656 application, relevant data was available showing the activity of various claimed compounds against various cell lines and xenografts. I have been informed none of this data was from clinical trials showing both safety and efficacy, as required by M.P.E.P. § 608.01(p): "a drug which is not sufficiently safe under the conditions of use for which it is said be [sic] be effective will not satisfy the utility requirement." Patent and Trademark Office, Manual of Patent Examining Procedure §608.01(p) (5th ed. 1983) [hereinafter "M.P.E.P."].

**B.     U.S. patent application No. 06/586,635 ("the '635 application")**

16.    On March 6, 1984, Mr. Mosher filed the '635 application, a File Wrapper Continuing Application under 37 CFR 1.62 of the '656 application.

17.    The claims presented in the '635 application were identical to the claims presented in the '656 application after the addition of claims 30 and 31 in the Amendment dated September 12, 1983.

18.    On October 24, 1984, Examiner Ford withdrew claims 28-30 from consideration, rejected claims 27 and 31, and objected to claims 1-26.   (CRT_SCH 107912.)  In the Office Action, Examiner Ford again conveyed the need for successful human clinical data:

> The District Court for the District of Columbia held the patent office should be careful and perhaps even reluctant to grant a patent on a medicinal composition until it has been thoroughly tested and tried by several physicians, on the theory that some members of the public would rely on the "official imprimatur" given to the medicinal by the granting of a patent thereon.
>
> Issenstead v. Watson, (DCDC 1957) 157 F Supp 7, 115 USPQ 408 and Schindler v. Comr. of Pats. (DCDC 1967) 269 F Supp 630, 155 USPQ 838.  Noted where an application discloses a therapeutic effect on humans or a cure for a human disease as the utility of a claimed process, the District Court held that proof of such utility is required unless one of ordinary skill in the art would accept the utility statement as obviously valid and correct. Radoev v. Brenner, Ferguson, (POBA 1957) 117 USPQ 229.
>
> Where utility is based on the alleged enhancement of activity of known medicinals, the CCPA upheld the Examiner's requirement that the applicant submit evidence which substantiated the allegation, the Court holding such requirement proper where utility is based on the type of allegation, unless one skilled in the art would accept them as obviously valid and correct.  In re Novak et al., (CCPA 1962) 306 F2d 924, 134 USPQ 335.
>
> The treatment of leukaemia is not a believable utility on it's face. Claim 31 is rejected under 35 USC 101.
>
> The board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof, when such use is a medical nature for the treatment of a serious disease, such as cancer. Ex parte Moore et al., (POBA 1960) 128 USPQ 8; In re Citron, (CCPA 1964) 325 F2d 248, 139 USPQ 516; In re Hartop et al., (CCPA 1962) 311 F2d 249, 135 USPQ 419.

> Remission of a specific leukaemia could be established, but has not been
> so accomplished here or so claimed.

(CRT_SCH 00107916-918.)

19.     In ¶ 58 of her report, Ms. Linck opines that "as of October 24, 1984, the compound claims remained without rejection." Once again, I disagree with Ms. Linck's characterization of Examiner Ford's Office Action. Nowhere in the October 24, 1984 Office Action is there a statement that Examiner Ford thought the claims were allowable. Ms. Linck's reliance on some distinction between "rejection" and "objection" is misplaced. Regardless of whether the examiner's disapproval of the claims are characterized as a "rejection" or an "objection," the fact remains that Examiner Ford was not prepared to allow claims 1-26 until "clarification" of utility was provided through human clinical results.

20.     Ms. Linck asserts that "relevant Phase I human clinical trial data for mitozolomide ("Important Compound C") became available" during prosecution of the '635 application. (Linck ¶ 61.) I disagree. Ms. Linck makes no reference in her report to M.P.E.P. § 608.01(p). During the pendency of the '635 application, that section stated in relevant part:

> Although absolute safety is not necessary to meet the utility requirement under this section, *a drug which is not sufficiently safe under the conditions of use for which it is said to be effective will not satisfy the utility requirement* (*In re Hartop et al.*, 50 CCPA 780, 311 F.2d 249, 135 USPQ 419; *In re Anthony*, 162 USPQ 594 (CCPA 1969); *In re Watson*, 186 USPQ 11 (CCPA 1975)). Proof of safety shall be required only in those cases where adequate reasons can be advanced by the examiner for believing that the drug is unsafe, and shall be accepted if it establishes a reasonable probability of safety.

M.P.E.P. § 608.01(p) (5th ed. 1983) (emphasis added). It is my understanding that the Phase I human clinical trial data for mitozolomide showed that it had serious side effects.

Thus, satisfactory Phase I human clinical trial data for mitozolomide was not available to the applicants to submit to the Patent Office during the pendency of the '656 application.

C.   **U.S. patent application No. 06/712,462 ("the '462 application")**

21.   On March 15, 1985, Mr. Mosher filed the '462 application, a File Wrapper Continuing Application under 37 CFR 1.62 of the '635 application.

22.   The claims presented in the '462 application were identical to the claims presented in the '635 application.

23.   On June 17, 1985, Examiner Ford withdrew claims 28-30 from consideration, rejected claims 27 and 31, objected to claims 1-26, and provisionally rejected claims 1-26 and 31.   (CRT_SCH 00107925-931.)   Examiner Ford once again declined to issue the claims in the absence of successful human clinical data:

> The District Court for the District of Columbia held the patent office should be careful and perhaps even reluctant to grant a patent on a medicinal composition until it has been thoroughly tested and tried by several physicians, on the theory that some members of the public would rely on the "official imprimatur" given to the medicinal by the granting of a patent thereon.
>
> Issenstead v. Watson, (DCDC 1957) 157 F Supp 7, 115 USPQ 408 and Schindler v. Comr. of Pats. (DCDC 1967) 269 F Supp 630, 155 USPQ 838. Noted where an application discloses a therapeutic effect on humans or a cure for a human disease as the utility of a claimed process, the District Court held that proof of such utility is required unless one of ordinary skill in the art would accept the utility statement as obviously valid and correct. Radoev v. Brenner, Ferguson, (POBA 1957) 117 USPQ 229.
>
> Where utility is based on the alleged enhancement of activity of known medicinals, the CCPA upheld the Examiner's requirement that the applicant submit evidence which substantiated the allegation, the Court holding such requirement proper where utility is based on that type of allegation, unless one skilled in the art would accept them as obviously valid and correct. In re Novak et al., (CCPA 1962) 306 F2d 924, 134 USPQ 335.
>
> The treatment of leukaemia is not a believable utility on it's face. Claim 31 is rejected under 35 USC 101.

> The Board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof, when such use is a medical nature for the treatment of a serious disease, such as cancer.  Ex parte Moore et al., (POBA 1960) 128 USPQ 8; In re Citron, (CCPA 1964) 325 F2d 248, 139 USPQ 516; In re Hartop et al., (CCPA 1962) 311 F2d 249, 135 USPQ 419.

> Remission of a specific leukemia could be established, but has not been so accomplished here or so claimed.

*Id.*

### D.     U.S. patent application No. 06/798,365 ("the '365 application")

24.     On November 18, 1985, Mr. Mosher filed the '365 application, a

File Wrapper Continuing Application under 37 CFR 1.62 of the '462 application.

25.     The claims presented in the '365 application are identical to the

claims presented in the'462 application.

26.     On January 24, 1986, Examiner Ford withdrew claims 29 and 30

from consideration and rejected claims 1-28 and 31.   (CRT_SCH 00107940-943.)

Examiner Ford again requested successful human clinical data:

> The treatment of leukemia is not a believable utility on it's face. Claims 28 and 31 are rejected under 35 USC 101.

> The Board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof, when such use is a medical nature for the treatment of a serious disease, such as cancer.  Ex parte Moore et al., (POBA 1960) 128 USPQ 8; In re Citron, (CCPA 1964) 325 F2d 248, 139 USPQ 516; In re Hartop et al., (CCPA 1962) 311 F2d 249, 135 USPQ 419.

> Remission of a specific leukemia could be established, but has not been so accomplished here or so claimed.

> The utility of a process for producing remissions in patients suffering from chronic myeloid leukemia was established by clinical reports and data, the acceptance of the drug employed by the Food and Drug Administration and by the American Medical Association Council on Pharmacy, the Board noting that remission, not cures, were alleged in the specification.

(CRT_SCH 00107942-943).

27.     In ¶ 71 of her report, Ms. Linck asserts that "[c]onsistent with his previous Office Actions, only claim 31 was rejected for lack of utility." I disagree. The cover page of the Office Action clearly states that claims 1-28 and 30 are rejected. (CRT_SCH 00107940.)   Furthermore, as discussed above, Ms. Linck's distinction between a "rejection" and an "objection" are, for these purposes, purely semantic. Examiner Ford did not allow any claims during the pendency of '365 application and once again requested successful human clinical data.

28.     Ms. Linck also asserts that "relevant Phase II human clinical data for mitozolomide ("Important Compound C") became available" during prosecution of the '365 application.  (Linck ¶ 74.)  I disagree.  As noted above, the relevant portion of M.P.E.P. § 608.01(p) in force during the pendency of the '365 application stated that:

> Although absolute safety is not necessary to meet the utility requirement under this section, *a drug which is not sufficiently safe under the conditions of use for which it is said to be effective will not satisfy the utility requirement* (In re Hartop et al., 50 CCPA 780, 311 F.2d 249, 135 USPQ 419; In re Anthony, 162 USPQ 594 (CCPA 1969); In re Watson, 186 USPQ 11 (CCPA 1975)).  Proof of safety shall be required only in those cases where adequate reasons can be advanced by the examiner for believing that the drug is unsafe, and shall be accepted if it establishes a reasonable probability of safety.

M.P.E.P. § 608.01(p) (5th ed. 1983) (emphasis added).  It is my understanding that the "relevant Phase II human clinical data for mitozolomide" that Ms. Linck refers to shows that mitozolomide had serious and unacceptable side effects and, as a consequence, no further clinical studies were conducted with mitozolomide.

**E.     U.S. patent application No. 06/885,397 ("the '397 application")**

29.     On July 18, 1986, Mr. Mosher filed the '397 application, a File Wrapper Continuing Application under 37 CFR 1.62 of the '365 application.

30.    The claims presented in the '397 application are identical to the claims presented in the '365 application.

31.    On October 21, 1986, Examiner Ford withdrew claim 29 from consideration and rejected claims 1-28.  (CRT_SCH 00107949.)  Examiner Ford again expressed the request for successful human clinical data:

> The treatment of leukaemia is not a believable utility on it's face.  Claims 27 and 28 are rejected under 35 USC 101.

> The Board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof, when such use is of a medical nature for the treatment of a serious disease, such as cancer.  Ex parte Moore et al., (POBA 1960) 128 USPQ 8; In re Citron, (CCPA 1964) 325 F2d 248, 139 USPQ 516; In re Hartop et al., (CCPA 1962) 311 F2d 249, 135 USPQ 419.

> Remission of a specific leukemia could be established, but has not been so accomplished here or so claimed.

> The utility of a process for producing remissions in patients suffering from chronic myeloid leukemia was established by clinical reports and data, the acceptance of the drug employed by the Food and Drug Administration and by the American Medical Association Council on Pharmacy, the Board noting that remission, not cures, were alleged in the specification.

(CRT_SCH 00107951-952.)

**F.    U.S. patent application No. 07/040,716 ("the '716 application")**

32.    On April 20, 1987, Mr. Mosher filed the '716 application, a File Wrapper Continuing Application under 37 CFR 1.62 of the '397 application.

33.    The claims presented in the '716 application are identical to the claims presented in the '397 application.

34.    On August 19, 1987, Examiner Ford rejected claims 1-31.  (CRT_SCH 00107964.)  Examiner Ford again indicated the need for successful human clinical data:

The treatment of leukemia or a malignant neoplasm is not a believable utility on it's face. Claims 30, 31 or 28 are rejected under 35 USC 101.

The Board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof, when such use is of a medical nature for the treatment of a serious disease, such as cancer. Ex parte <u>Moore et al.</u>, (POBA 1960) 128 USPQ 8; <u>In re Citron</u>, (CCPA 1964) 325 F2d 248, 139 USPQ 516; <u>In re Hartop et al.</u>, (CCPA 1962) 311 F2d 249, 135 USPQ 419.

Remission of a specific leukemia could be established, but has not been so accomplished here or so claimed.

The utility of a process for producing remissions in patients suffering from chronic myeloid leukemia was established by clinical reports and data, the acceptance of the drug employed by the Food and Drug Administration and by the American Medical Association Council on Pharmacy, the Board <u>noting that remission, not curse</u>, [sic] were alleged in the specification.

(CRT_SCH 00107965-966.)

### G.     U.S. patent application No. 07/135,473 ("the '473 application")

35.     On December 21, 1987, Mr. Mosher filed the '473 application, a File Wrapper Continuing Application under 37 CFR 1.62 of the '716 application.

36.     The claims presented in the '473 application are identical to the claims presented in the '716 application.

37.     On October 4, 1988, Examiner Ford withdrew claim 29 from consideration and rejected claims 1-28, 30 and 31. Consistent with the earlier Office Actions, Examiner Ford again conveyed the requirement for successful human clinical data:

The treatment of leukemia is not a believable utility on it's face. Claims 27, 28, 30 and 31 are rejected under 35 USC 101.

The Board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof, when such use is of a medical nature for the treatment of a serious

disease, such as cancer. Ex parte <u>Moore et al.</u>, (POBA 1960) 128 USPQ 8; <u>In re Citron</u>, (CCPA 1964) 325 F2d 248, 139 USPQ 516; <u>In re Hartop et al.</u>, (CCPA 1962) 311 F2d 249, 135 USPQ 419.

Remission of a specific leukemia could be established, but has not been so accomplished here or so claimed.

The utility of a process for producing remissions in patients suffering from chronic myeloid leukemia was established by clinical reports and data, the acceptance of the drug employed by the Food and Drug Administration and by the American Medical Association Council on Pharmacy, the Board <u>noting that remission, not cures,</u> were alleged in the specification.

(CRT_SCH 00107982-983.)

> **H.    U.S. patent application No. 07/338,515 ("the '515 application")**

38.    On March 3, 1989, Mr. Mosher filed the '515 application, a File Wrapper Continuing Application under 37 CFR 1.62 of the '473 application.

39.    The claims presented in the '515 application are identical to the claims presented in the '473 application.

40.    On June 30, 1989, Examiner Johann Richter issued an Office Action.  In it, he rejected claims 1-31.  (CRT_SCH 00107990.)  Examiner Richter repeated the USPTO's request that the applicants submit successful human clinical data:

> The treatment of leukemia or a malignant neoplasm is not a believable utility on it's face.  Claims 30, 31 or 28 are rejected under 35 USC 101.

> The Board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof, when such use is of a medical nature for the treatment of a serious disease, such as cancer. Ex parte <u>Moore et al.</u>, (POBA 1960) 128 USPQ 8; <u>In re Citron</u>, (CCPA 1964) 325 F2d 248, 139 USPQ 516; <u>In re Hartop et al.</u>, (CCPA 1962) 311 F2d 249, 135 USPQ 5419.

> Remission of a specific leukemia could be established, but has not been so accomplished here or so claimed.

> The utility of a process for producing remissions in patients suffering from chronic myeloid leukemia was established by clinical reports and data, the acceptance of the drug employed by the Food and Drug Administration

and by the American Medical Association Council on Pharmacy, the Board noting that remission, not cure, [sic] were alleged in the specification.

(CRT_SCH 00107991-992.)

I.   **U.S. patent application No. 07/456,614 ("the '614 application")**

41.   On December 29, 1989, Mr. Mosher filed the '614 application, a File Wrapper Continuing Application under 37 CFR 1.62 of the '515 application.

42.   The claims presented in the '614 application are identical to the claims presented in the '515 application.

43.   On May 1, 1990, Examiner Richter withdrew claims 28-30 from consideration and rejected claims 1-27 and 31.   (CRT_SCH 00108007.)   Examiner Richter, again, requested successful human clinical data:

> Claims 1-27 and 31 are rejected under 35 U.S.C. 101 because the treatment of leukemia is not a believable utility on it's face.
>
> The Board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof, when such use is of a medical nature for the treatment of a serious disease, such as cancer. Ex parte Moore et al., (POBA 1960) 128 USPQ 8; In re Citron, (CCPA 1964) 325 F2d 248, 139 USPQ 516; In re Hartop et al., (CCPA 1962) 311 F2d 249, 135 USPQ 5419.
>
> Remission of a specific leukemia could be established, but has not been so accomplished here or so claimed.
>
> The utility of a process for producing remissions in patients suffering from chronic myeloid leukemia was established by clinical reports and data, the acceptance of the drug employed by the Food and Drug Administration and by the American Medical Association Council on Pharmacy, the Board noting that remission, not cure, were alleged in the specification.

(CRT_SCH 00108010-011.)

44.     On October 25, 1990, Rhone-Poulenc Limited, the assignee of the '614 application, transferred Power of Attorney to Frederick F. Calvetti, Esq. of Morgan & Finnegan. (CRT_SCH 00108016-018.)

45.     In ¶ 111 of her report, Ms. Linck opines that "[d]uring the prosecution of the '614 Application, relevant Phase I human clinical data for temozolomide ('Important Compound A') became available." Ms. Linck cites to pages 56-57 of the deposition testimony of Dr. Gordon Blackledge in connection with her testimony. I disagree with Ms. Linck's conclusions. It is my understanding that the document Dr. Blackledge was discussing at pages 56-57 of his deposition was a draft of the Phase I trial of temozolomide that was written before that study was complete. I also understand that the paper describing the Phase I trail of temozolomide was not submitted for publication until June 25, 1991 and in revised form on October 17, 1991.

### J.     U.S. patent application No. 07/607,221 ("the '221 application")

46.     On November 1, 1990, Mr. Calvetti filed the '221 application, a File Wrapper Continuing Application under 37 CFR 1.62 of the '614 application.

47.     The claims presented in the '221 application are identical to the claims presented in the '614 application.

48.     On April 18, 1991, Examiner Richter withdrew claims 28-30 from consideration and rejected claims 1-27 and 31. Examiner Richter yet again, set forth in the Office Action the request for successful human clinical data:

> Claims 1-27 and 31 are rejected under 35 U.S.C. § 101 because the treatment of leukemia is not a believable utility on it's face.

> The Board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof, when such use is of a medical nature for the treatment of a serious disease, such as cancer. Ex parte <u>Moore et al.</u>, (POBA 1960) 128 USPQ

8; In re Citron, (CCPA 1964) 325 F2d 248, 139 USPQ 516; In re Hartop et al., (CCPA 1962) 311 F2d 249, 135 USPQ 5419.

Remission of a specific leukemia could be established, but has not been so accomplished here or so claimed.

The utility of a process for producing remissions in patients suffering from chronic myeloid leukemia was established by clinical reports and data, the acceptance of the drug employed by the Food and Drug Administration and by the American Medical Association Council on Pharmacy, the Board nothing that remission, not cure, were alleged in the specification.

(CRT_SCH 00108029-030 (emphasis added).)

### K.   U.S. patent application No. 07/781,020 ("the '020 application")

49.   On October 18, 1991, Eugene C. Rzucidlo, a colleague of Mr. Calvetti, filed the '020 application, which is a continuation-in-part of the '221 application.   Along with the '020 application, Mr. Rzucidlo submitted a Preliminary Amendment that included the following Remarks:

Applicants note that, in the parent application, the Examiner had rejected compound claims 1 to 27 under 35 USC § 101.   It is believed that this rejection should be reconsidered in view of the disclosure of other utilities for the present compounds as well as the disclosure at page 8 and 9, connecting paragraph wherein the effectiveness of the present compounds is demonstrated.

The method claims are also believed to be patentable under 35 USC § 101 based upon the same disclosure in the instant application.

(CRT_SCH 00108159-160.)

50.   The '020 application includes two additional claims – claims 32 and 33.   These are directed to a method of treating glioma and mycosis fungoides, respectively, using the tetrazine derivatives claimed in claim 1.   Otherwise, the claims presented in the '020 application are identical to the claims presented in the '221 application.

3733943_2.DOC

51.     The USPTO issued a Notice to File Missing Parts of Application on November 8, 1991. (CRT_SCH 00108161.) Mr. Calvetti submitted an Information Disclosure Statement on March 4, 1992. (CRT_SCH 00108162.) Mr. Calvetti responded to the Notice to File Missing Parts of Application on April 20, 1992. (CRT_SCH 00108185-251.)

52.     On August 6, 1992, Examiner Richter issued an Office Action withdrawing claims 29, 32, and 33 from consideration and rejecting claims 1-28, 30 and 31. Examiner Richter once again requested successful human data:

> **Claims 1-28, 30 and 31 are rejected under 35 U.S.C. § 112, first paragraph, as the disclosure is enabling only for claims limited to the specific antineoplastic activity tested and listed on p.8.  See M.P.E.P. §§ 706.03(n) and 706.03(z).**
>
> The Board of Appeals and the CCPA have held that even though the specification does not mention human use specifically, the Patent Office is not precluded from finding an inference of human use and require proof thereof when such use is of a medical nature for the treatment of a serious disease, such as cancer.  Ex parte Moore et al., (POBA 1960) 128 USPQ 8; In re Citron, (CCPA 1964) 325 F2d 248, 139 USPQ 516; In re Hartop et al., (CCPA 1962) 311 F2d 249, 135 USPQ 541.
>
> Remission of a specific leukemia could be established, but has not been so accomplished here or so claimed.

(CRT_SCH 00108271.)  In my opinion, the fact that Examiner Richter continued to reject the claims for lack of utility even after the applicants specifically pointed to the recitation of pre-clinical data contained in Column 4 of the '291 patent confirms the fact that the examiners were seeking human clinical data.

53.     On December 7, 1992, Mr. Calvetti filed an Associate Power of Attorney appointing Barbara L. Renda, Stefan J. Klauber, David A. Jackson, and Israel Nissenbaum of Kluaber & Jackson as associate attorneys with full power to prosecute the application.

54.     On February 5, 1993, Barbara L. Renda responded to Examiner Richter's utility rejection set forth in the August 6, 1992 Office Action (CRT_SCH 00108286-293.) In addition to responding to the utility rejection, Ms. Renda made minor amendments to claim 1, to address a rejection under 35 U.S.C. § 112. This amendment did not substantially alter the scope of claim 1.

55.     On April 16, 1993, Examiner Bernard Dentz issued a Notice of Allowability.

56.     Except for the minor change noted above in ¶ 54, the compound claims 1-26 as allowed by Examiner Dentz are identical to the compound claims 1-26 contained in the original '656 application.

## III.    THE PTO APPLIED A STRICT STANDARD OF UTILITY THROUGHOUT PROSECUTION OF THE APPLICATION THAT LED TO THE '291 PATENT

57.     Throughout the pendency of the '291 patent, the MPEP required, and the Patent Examining Corps applied, a strict standard of utility.  In particular, the MPEP required that "if the utility relied on is directed *solely* to the treatment of humans, evidence of utility, if required, must generally be clinical evidence. (*Ex parte Timmis*, 123 USPQ 581) although animal tests may be adequate where the art would accept these as appropriately correlated with human utility."  M.P.E.P. § 608.01(p) (5th ed. 1983). The MPEP is binding upon Examiners.  M.P.E.P. Forward (5th ed. 1983) ("It contains instructions to examiners, . . . and outlines current procedures which the examiners are required or authorized to follow . . . .").

58.     The '291 patent application was originally filed on Aug. 23, 1982. At that time, the latest version of the MPEP was the 8th revision of the Fourth Edition from October 1981. Section 608.01(p) provided the relevant guidance in connection with

3733943_2.DOC

Specification Completeness and "Guidelines for Considering Disclosures of Utility in Drug Cases."

59.     In August 1983 a new edition of the MPEP, the Fifth Edition, was released. It was this edition that was cited in the November 18, 1983 Office Action by Examiner Ford -- the first Office Action relating to utility. The relevant portion of the rule provided:

> Utility must be definite and in currently available form; (*Brenner v. Mason*, 383 U.S. 519, 148 USPQ 689) not merely for further investigation or research but commercial availability is not necessary. Mere assertions such as "therapeutic agents," (*In re Lorenz et al.*, 49 CCPA 1227, 305 F.2d 875, 134 USPQ 312; cf. *Ex parte Brockmann et al.*, 127 USPQ 57) "for pharmaceutical purposes," (*In re Diedrich*, 50 CCPA 1355, 318 F.2d 946, 138 USPQ 128) "biological activity," (*In re Kirk et al.*, 54 CCPA 1119, 153 USPQ 48; *Ex parte Lanham*, 135 USPQ 106) "intermediate," (*In re Joly et al.*, 54 CCPA 1159; 153 USPQ 45; *In re Kirk et al.*, 54 CCPA 1119; 153 USPQ 48) and for making further unspecified preparations are regarded as insufficient.
>
> If the asserted utility of a compound is believable on its face to persons skilled in the art in view of the contemporary knowledge in the art, then the burden is upon the examiner to give adequate support for rejections for lack of utility under this section (*In re Gazave*, 54 CCPA 1524, 154 USPQ 92). On the other hand, incredible statements (*In re Citron*, 51 CCPA 852, 325 F.2d 248, 139 USPQ 516; *In re Oberweger*, 28 CCPA 749, 115 F.2d 826, 47 USPQ 455; *Ex parte Moore et al.*, 128 USPQ 8) or statements deemed unlikely to be correct by one skilled in the art (*In re Ruskin*, 53 CCPA 872, 354 F.2d 395, 148 USPQ 221; *In re Pottier*, 54 CCPA 1293, 153 USPQ 407; *In re Novak et al.*, 49 CCPA 1283, 306 F.2d 924, 134 USPQ 335. See also, *In re Irons*, 52 CCPA 938, 340 F.2d 974, 144 USPQ 351) in view of the contemporary knowledge in the art will require adequate proof on the part of applicants for patents.
>
> Proof of utility under this section may be established by clinical or *in vivo* or *in vitro* data, or combinations of these, which would be convincing to those skilled in the art (*In re Irons*, 52 CCPA 938, 340 F.2d 924, 144 USPQ 351; *Ex parte Paschall*, 88 USPQ 131; *Ex parte Pennell et al.*, 99 USPQ 56; *Ex parte Ferguson*, 117 USPQ 229; *Ex parte Timmis*, 123 USPQ 581). More particularly, if the utility relied on is directed *solely* to the treatment of humans, evidence of utility, if required, must generally be clinical evidence. (*Ex parte Timmis*, 123 USPQ 581) although animal tests may be adequate where the art would accept these as appropriately correlated with human utility (*In re Hartop et al.*, 50 CCPA 780, 311 F.2d

249, 135 USPQ 419; *Ex parte Murphy*, 134 USPQ 134). If there is no assertion of human utility, (*Blicke v. Treves*, 44 CCPA 753, 241 F.2d 718, 112 USPQ 472; *In re Krimmel*, 48 CCPA 1116, 292 F.2d 948, 130 USPQ 215; *In re Dodson*, 48 CCPA 1125, 292 F.2d 943, 130 USPQ 224; *In re Hitchings*, 52 CCPA 1141, 342 F.2d 80, 144 USPQ 637) or if there is an assertion of animal utility, (*In re Bergel et al.*, 48 CCPA 1102, 292 F.2d 955, 130 USPQ 206; *Ex parte Melvin*, 155 USPQ 47) operativeness for use on standard test animals is adequate for patent purposes.

Exceptions exist with respect to the general rule relating to the treatment of humans. For example, compositions whose properties are generally predictable from a knowledge of their components, such as laxatives, antacids and certain topical preparations, require little or no clinical proof (*Ex parte Harrison et al.*, 129 USPQ 172; *Ex parte Lewin*, 140 USPQ 70).

Although absolute safety is not necessary to meet the utility requirement under this section, *a drug which is not sufficiently safe under the conditions of use for which it is said to be effective will not satisfy the utility requirement* (*In re Hartop et al.*, 50 CCPA 780, 311 F.2d 249, 135 USPQ 419; *In re Anthony*, 162 USPQ 594 (CCPA 1969); *In re Watson*, 186 USPQ 11 (CCPA 1975)). Proof of safety shall be required only in those cases where adequate reasons can be advanced by the examiner for believing that the drug is unsafe, and shall be accepted if it establishes a reasonable probability of safety.

(emphasis added).

> 60.     During the prosecution of the '291 patent, the MPEP was revised

multiple times. Section 608.01(p) of the MPEP, however, was not revised again until

May 1988. This was the 8th revision of the Fifth Edition. The revision slightly altered

the rules and added case citations (the additions are in bold):

. . .

. . . See also, *In re Irons*, 52 CCPA 938, 340 F.2d 974, 144 USPQ 351; *Ex parte Busse*, **1 USPQ 2d 1908)** in view of the contemporary knowledge in the art will require adequate proof on the part of applicants for patents.

Proof of utility under this section may be established by clinical or *in vivo* or *in vitro* data, or combinations of these, which would be convincing to those skilled in the art (*In re Irons*, 52 CCPA 938, 340 F.2d 924, 144 USPQ 351; *Ex parte Paschall*, 88 USPQ 131; *Ex parte Pennell et al.*, 99 USPQ 56; *Ex parte Ferguson*, 117 USPQ 229; *Ex parte Timmis*, 123 USPQ 581; *Ex Parte Krepilka*, **231 USPQ 746 (PO Bd. Pa. App & Inter.**

> **1986),** *Ex Parte Chwang*, **231 USPQ 751 (PO Bd. Pat. App. & Inter. 1986)**. More particularly, if the utility relied on is directed solely to the treatment of humans, evidence of utility, if required, must generally be clinical evidence. *(Ex parte Timmis*, 123 USPQ 581) although animal tests may be adequate where the art would accept these as appropriately correlated with human utility (*In re Hartop et al.*, 50 CCPA 780, 311 F.2d 249, 135 USPQ 419; *Ex parte Murphy*, 134 USPQ 134) **or where animal tests are coupled with other evidence, including clinical evidence and a structural similarity to compounds marketed commercially for the same indicated uses, (*In re Jolles*, 628 F.2d 1322, 206 USPQ 885 (CCPA 1980))**. . . .

> **The court in *Nelson v. Bowley*, 626 F.2d 853, 206 USPQ 881 (1980) stated that knowledge of pharmacological activity of any compound is obviously beneficial to the public and concluded that adequate proof of any such utility constitutes a showing of practical utility. Where the disclosed in vitro utility is supplemented by the similar in vitro and in vivo pharmacological activity of structurally similar compounds, the in vitro utility is sufficient to comply with the practical utility requirement of 35 U.S.C. 101.** *Cross v. Iizuka*, **224 USPQ 739 (Fed. Cir. 1985).**

> . . .

M.P.E.P. § 608.01(p) (5th ed., 8th rev. 1988). In her report, Ms. Linck attaches considerable significance to the Board decision in *Ex Parte Krepelka*. (see infra ¶¶ 63.) A citation to that decision is included in this version of the M.P.E.P.. It is important to note, however, that the description of the utility standard remains unchanged notwithstanding the citation to *Krepelka*. The other language added to this section of the M.P.E.P. further underscores the fact that in order to establish utility, animal testing must either be accepted in the art as appropriately correlated with human activity or coupled with test results from other structurally related compounds.

      61.    The relevant section, 608.01(p), was not revised again until after the Notice of Allowability was issued on April 16, 1993 but prior to the issuance of the patent on Nov. 9, 1993. The 15th revision was released in August of 1993. This revision

did not affect the substance of the rule and was merely an edit to reflect proper citation formatting.

62.     During the pendency of the '291 patent the Patent Office's policies toward the examination of anti-cancer claims was evolving. This is reflected for example by the inconsistent and highly fact-specific guidance on the utility requirement provided by the Board of Patent Appeals and Interferences.

63.     For example, as stated in ¶ 60 above, Ms. Linck makes reference to *Ex Parte Krepelka*, 231 U.S.P.Q. 746 (B.P.A.I. 1986), a case cited by the applicants for the '291 patent in their February 5, 1993 Response to the August 6, 1992 Office Action. In that case, Examiner-in-Chief Goldstein stated that "decisional law would seem to indicate that the utility in question [treatment of cancer] is sufficiently unusual to justify an examiner's requiring substantiating evidence. Substantiating evidence may be in the form of animal tests which constitute recognized screening procedures with clear relevance to utility in humans." *Id.* at 747.

64.     Less than a month after the *Krepelka* decision another Board decision, also written by Examiner-in-Chief Goldstein, held that the applicants' submission of recognized screening procedures was not sufficient to establish utility. *Ex Parte Busse*, 1 U.S.P.Q.2d 1908 (B.P.A.I. 1986). Specifically, the Board concluded that "the affiants have concluded only 'that such results warrant further study of Appellants' compound for its suitability as a human antineoplastic and antimetastatic drug.' Appellants have cited no authority to support the proposition that evidence 'warranting further study' is equivalent to evidence 'showing' the type of utility required by 35 U.S.C. 101." *Id.* at 1909. The Board in *Busse* also noted that "[e]ach case of this type must be dealt with on its own facts . . . ." *Id.*

3733943_2.DOC

65.     The PTO's application of a strict utility standard during the time period in which the '291 patent was pending is further evident from the Transcripts of the Public Hearings on Biotechnology which took place before Bruce Lehman, Commissioner of Patents and Trademarks, on October 17, 1994. Public Hearings on the Patenting of Biological Inventions (U.S. Dept. of Commerce, Patent and Trademark Office Oct. 17, 1994), available at http://www.uspto.gov/web/offices/com/hearings/ biotech/biotrans.html, (CRT_SCH 00259119-311); *see also* Intellectual Prop. Comm., Biotechnology Indus. Org., Comments of the Biotech Industry Organization (1994), available at http://www.uspto.gov/go/com/hearings/biotech/bioind.html, (CRT_SCH 00259312-444).

### 1.     *In re Brana*

66.     The issue of whether animal data is sufficient to establish utility for anti-cancer compounds was not conclusively settled until the Federal Circuit's decision in *In re Brana*, 51 F.3d 1560 (Fed. Cir. 1995). The facts of that case illustrate the PTO's application of the utility standard during the 1980s and early 1990s.

67.     The applicant in *Brana* submitted claims directed to anti-cancer compounds which ultimately issued as U.S. Patent 5,552,544 ("the '544 patent"). ('544 File History) (CRT_SCH 00258746-00259073).   After a series of Office Actions addressing other issues with the claims, the examiner issued a rejection for lack of utility, specifically rejecting the applicants reliance on screening data: "It is an unfortunate fact that the vast majority of compounds which are successful in inhibiting the growth of cultured cancer cells prove <u>not</u> to be successful for the treatment of disease.  It is (partly) for that reason that so many thousands of compounds are screened every year." (*Id.* at Nov. 7, 1990 Office Action 5) (CRT_SCH 0028825-831).  After amending their claims,

the applicants once again argued utility based on screening data and once again, the examiner rejected the claims, stating "[s]creening tests are not designed to demonstrate utility. They are just designed to locate promising candidates for real testing (see Busse)." (*Id.* at May 1, 1991 Office Action 3) (CRT_SCH 00258840-43).

68. In response to the examiner's second utility rejection, the applicants in *Brana* submitted a declaration describing the results of pre-clinical testing in the L1210 tumor model. Once again, the examiner rejected the claims for lack of utility noting that "[t]hese tests are not and have not been recognized to be reliable indicators of clinical activity." (*Id.* at July 23, 1991 Advisory Action 2) (CRT_SCH 00258854-856).

69. An appeal to the Board followed and, in another opinion written by Examiner-In-Chief Goldstein, the Board affirmed the examiner's rejection, holding "we agree with the examiner's well reasoned, well stated and fully supported by citation of relevant precedent position in every particular, and any further comment which we might add would be redundant."

70. On appeal, the Federal Circuit reversed. The Federal Circuit decision begins with a discussion regarding the sufficiency of *in vivo* pre-clinical tests in establishing utility under 35 U.S.C. § 101. After finding that "NCI apparently believes that these tests are statistically significant because it has explicitly recognized both the P388 and L1210 murine tumor models as standard screening tests for determining whether new compounds may be useful as antitumor agents," the Federal Circuit held that this sort of pre-clinical data is enough to establish utility under 35 U.S.C. § 101. *Id.* at 1567-68.

71. Subsequent changes to the M.P.E.P. reflect the impact of the *Brana* decision. In the first revision of the M.P.E.P. published after the *Brana* decision, a new

section entitled "Special Considerations for Asserted Therapeutic or Pharmacological

Utilities was created.   This new section is substantially different from the relevant

sections of the M.P.E.P. that were applicable while the applications that led to the '291

patent were pending:

> The Federal Courts have consistently reversed rejections by the Office asserting a lack of utility for inventions claiming a pharmacological or therapeutic utility where an applicant has provided evidence that reasonably supports such a utility.   In view of this, Office personnel should be particularly careful in their review of evidence provided in support of an asserted therapeutic or pharmacological utility.
>
> c.   *Data from in vitro or animal testing is generally sufficient to support therapeutic utility.*
>
> If reasonably correlated to the particular therapeutic or pharmacological utility, data generated using in vitro assays, or from testing in an animal model or combination thereof almost invariably will be sufficient to establish therapeutic or pharmacological utility for a compound, composition or process.   A cursory review of cases involving therapeutic inventions where 35 U.S.C. § 101 was the dispositive issue illustrates the fact that the Federal courts are not particularly receptive to rejections under 35 U.S.C. § 101 based on inoperability.   Most striking is the fact that in those cases where an applicant supplied a reasonable evidentiary showing supporting an asserted therapeutic utility, almost uniformly the 35 U.S.C. 101-based rejection was reversed.
>
> . . . .
>
> If an applicant provides data, whether from *in vitro* assays or animal tests or both, to support an asserted utility, and an explanation of why that data supports the asserted utility, the Office will determine if the data and the explanation would be viewed by one of skill in the art as being reasonably predictive of the asserted utility....
>
> . . . .
>
> d. *Human clinical data*
>
> Office personnel should not impose on applicants the unnecessary burden of providing evidence from human clinical trials.   There is no decisional law that requires an applicant to provide data from human clinical trials to establish utility for an invention related to treatment of human disorders...even with respect to situations where no art-recognized animal models existed for the human disease encompassed by the claims.

3733943_2.DOC

*f. Treatment of specific disease conditions*

Claims directed to a method of treating or curing a disease for which there have been no previously successful treatments or cures warrant careful review for compliance with 35 U.S.C. 101....Such a determination has always required a good understanding of the state of the art as of the time that the invention was made. For example, in the 1960's, there were a number of cases where an asserted use in treating cancer in humans was viewed as 'incredible.' The fact that there is no known cure for a disease, however, cannot serve as the basis for a conclusion that such an invention lacks utility. Rather, Office personnel must determine if the asserted utility for the invention is credible based on the information disclosed in the application. Only those claims for which an asserted utility is not <u>credible</u> should be rejected.

M.P.E.P. § 2107.02 (6th ed., 1st rev. 1995) (internal citations omitted) (emphasis in original) (CRT_SCH 00259100-00259104.)

## IV. MS. LINCK'S OPINIONS ABOUT "DELAY" ARE INCORRECT

### A. Prosecution of the '291 Patent Proceeded in Accordance with USPTO Policies and Procedures in Effect at the Time

72.     In ¶ 143 of her report, Ms. Linck states that "[d]uring [her] entire 25 year career in patent practice, including [her] time as the Solicitor of Patents and Trademarks and an Administrative Patent Judge at the USPTO, [she has] never seen the type of delay in prosecuting a patent that occurred in this case -- delay obtained by doing substantially nothing except refiling their application over and over again." I do not agree with Ms. Linck's characterization of the prosecution of the applications leading to the patent-in-suit -- particularly with respect to the terms "delay" and "doing substantially nothing." That does not accurately characterize the prosecution history. During the pendency of the applications that resulted in the patent-in-suit, the USPTO repeatedly asked applicants for successful human clinical data (*see* supra ¶¶ 12, 18, 23, 26, 31, 34, 37, 40, 43, 48, 52), and it is my understanding that there is evidence that applicants diligently pursued such data during that time.

3733943_2.DOC

73.     Ms. Linck opines in ¶ 144 of her report that "the '291 patent would have issued no later than 1987 (and likely earlier), had Applicants responded to the first Office Action in their first-filed application, the '656 application, in a manner similar to the way they responded 10 years later." I see no support for Ms. Linck's speculative suggestion. It is impossible to know how different examiners would respond to different arguments at different points in time. The contemporaneous intrinsic evidence shows that the USPTO repeatedly requested successful human clinical data to support applicants' statement of utility (*see* supra ¶¶12, 18, 23, 26, 31, 34, 37, 40, 43, 48, 52) , and it is my understanding that applicants diligently pursued such data.

74.     Moreover, Ms. Linck's statement in ¶ 144 of her report that "compound claims 1-26 . . . were not rejected for several years" is not correct. In several early Office actions, the Examiner stated that "claims 1-26 are *objected to* pending clarification of utility, and possible double patenting noted above" (CRT_SCH 00107902, CRT_SCH 00107918, CRT_SCH 00107943) (emphasis added). However, in later Office actions, the Examiner stated that "claims 1-28 are *rejected*, pending clarification of utility, under 35 USC 101" (CRT_SCH 00107953) (emphasis added). As noted above in ¶¶ 13, 19, 27, the distinction that Ms. Linck attempts to rely on is meaningless. Regardless of whether the Examiner was using the term "objected to," or "rejected," the fact remains that the claims were not allowable until utility could be established. Indeed the fact that the Examiner used both the term "objected to" and "rejected" with respect to the utility requirement demonstrates that the Examiner was not attempting to distinguish between an "objection" and a "rejection."

75.     In ¶ 146 of her report, Ms. Linck states that, in her opinion, "Applicants could have obtained allowance of their patent by responding to the

Examiner's Office Actions and making arguments." Again, this is speculation that is inconsistent with the prosecution records. There are numerous ways to pursue a patent application in accordance with controlling Patent Office guidelines. Here, the applicants were faced with the choice of fighting the Examiner's request for successful human clinical data or seeking the data that he was requesting. It is my understanding that evidence suggests that the applicants diligently pursued the requested data. The applicants cannot now be faulted for doing what the USPTO asked of them simply because USPTO practices were evolving during the pendency of their patent applications. Further, Ms. Linck states that "animal data, available when the first application was filed, would have sufficed." (Linck ¶ 146.) This statement is contradicted by the Examiner's request for *human* data (*see* supra ¶¶12, 18, 23, 26, 31, 34, 37, 40, 43, 48, 52) and by the appeals of *Krepelka* and *Brana* (*see* supra ¶¶ 63, 66-70).

76.     At ¶¶ 163-169, Ms. Linck opines that Plaintiffs' position that the Examiner repeatedly requested human data is somehow incorrect. Ms. Linck further opines that "such data was available long before the last application was filed." (Linck ¶ 146.) Again, I disagree with Ms. Linck. The Examiner's request for human data is clear from the Office Actions and the M.P.E.P. sections and cases cited therein (*see* supra ¶¶12, 18, 23, 26, 31, 34, 37, 40, 43, 48, 52). As stated above, I understand that the data cited by Ms. Linck as being "available long before the last application was filed" did not meet the M.P.E.P.'s requirements for successful human clinical data.

77.     In ¶ 147 of her report, Ms. Linck characterizes the allowance of the '020 application as being with "ease," "as soon as Applicants responded to the Office Action." In my opinion, Ms. Linck overlooks the applicants' diligent efforts to obtain the requested successful human clinical data and the evolution in USPTO policies and

practices that occurred during the pendency of the applications that led to the '291 patent. Ms. Linck has no basis to conclude that applicants' response of February 5, 1993 could have been filed and positively received by an Examiner any earlier than it was. There were, for example, different Examiners, different Commissioners of the USPTO, different legislatures, different policies and practices in place. For these same reasons, the circumstances of other allegedly "similar applications allowed (even by Examiner Ford) during the same time period" is not relevant. (Linck ¶ 147.) Ms. Linck is incorrect to assume that an Examiner would have responded favorably to the same arguments had they been made earlier.

### 1. During the Nine Years Ms. Linck Alleges Applicants "Did Nothing," They Diligently Pursued Successful Human Data – Just As The Patent Office Requested

78.     In ¶ 148 of her report, Ms. Linck states that the rejections made by the Examiner on November 18, 1983 were "maintained in some form, frequently word for word, throughout the pendency of all 11 applications." That is precisely why applicants diligently pursued the data that the Examiner repeatedly requested. The Examiner asked for data, and the applicants went in search of that data.

79.     In ¶ 150 of her report, Ms. Linck presents her conclusion that "Applicants *literally did nothing substantive* in response to these Office Actions." (emphasis added). This characterization is incorrect given the evidence reflecting the applicants' efforts to obtain the successful human clinical data requested by the USPTO. I disagree with Ms. Linck's characterization of the applicants' actions as "unprecedented" -- particularly in light of the evidence of the USPTO's request for successful human clinical data, and the applicants diligent pursuit of such data.

### 2. Applicants' February 5, 1993 Arguments Need Not Have Been Made Any Earlier

80.    In ¶ 157 of her report, Ms. Linck asserts that 'most of Applicants' arguments could have been made during the prosecution of the original application, the '656 application, filed in 1982." Ms. Linck's speculative assertion is not consistent with the prosecution history.  Different attorneys *could* take any number of different actions during the course of prosecuting a patent application.  Ms. Linck is second-guessing the actions of an attorney who was faced with a request from an Examiner for successful human clinical data.  In my opinion, it is entirely proper to collect the information requested by the Examiner.  Doing so was entirely consistent with the Patent Office guidelines in force at the time.

81.    Ms. Linck notes, in ¶ 158 of her report that "[a]t the time of allowance in 1993, the claims had not materially changed from those pending in 1982. . . ." As evidenced by the file history record, the applicants were not asking for new or different claims; they were asking for claims substantially similar to those originally filed.  Applicants did not withhold from the Patent Office the substance of the claims they sought to have issued.  To the contrary, applicants repeatedly presented and requested allowance of the claims they originally sought, and, consistent with express instructions from the Examiner, they sought successful human clinical data to support those claims.

82.    In ¶ 160, Ms. Linck again argues that applicants *could* have made an argument presented in the February 5, 1993 Response.  Once again, this is pure speculation.

### 3.    Applicants Did Not Delay Prosecution

83.    In her "excised" report, Ms. Linck appears to have abandoned the literal use of the words "unreasonable delay." She continues, however, to offer opinions that the applicants' behavior was "unprecedented" and to opine on what the applicants "could and should" have done.    It is clear that these opinions are directed to the reasonableness or unreasonableness of the applicants' purported delay, which I understand that Plaintiffs believe to be inconsistent with the Court's established guidelines for expert testimony of the type Ms. Linck seeks to offer.

### (a)    The Examiner *Did* Demand Human Data

84.    In ¶ 163 of her report, Ms. Linck asserts that "the multiple Office Actions did not 'demand' or even clearly suggest the need for clinical data. . . ." I disagree. This is contradicted by the plain words of the Office Actions and by the case law, Board decisions and MPEP that were cited therein and remained in effect throughout the prosecution of the patent applications that led to the '291 patent. (*See supra* ¶¶ 12, 18, 23, 26, 31, 34, 37, 40, 43, 48, 52.)

85.    In ¶ 164, Ms. Linck opines on the "entire tone" of the Office Actions and concludes that "[r]ather than demanding human data, based on [her] more than twenty-five years of experience in USPTO practice, . . . the Examiner was unsure whether he should reject or allow the claims and was seeking clarification from Applicants." In this regard, Ms. Linck suggests that applicants could have requested an interview or asked for clarification in an Office Action response. Again, this is irrelevant hindsight speculation. The attorneys in this case attempted to collect the data to respond to the Examiners' requests, which was entirely appropriate in view of the Examiner's Office Actions and the controlling Patent Office rules at the time.

86.     In ¶¶ 165 and 167, Ms. Linck further suggests that applicants could have argued that they were not intending solely on human use or could have submitted a declaration arguing a person of ordinary skill in the art would recognize the utility of the claimed compounds in humans based upon the animal tests.   Once again this is speculation.  She makes no attempt to determine if these arguments were in fact available to the applicants.

87.     In ¶ 169 of her report, Ms. Linck contends that she has "not seen any evidence to suggest that the USPTO modified its approach to examining cancer compounds during the pendency of the applications leading to the '291 patent."  In my opinion, this contention is refuted by the Board decisions in *Ex Parte Krepelka*, *Ex Parte Brana*, *Ex Parte Busse*, the 1983, 1988, 1993 and 1995 revisions to the M.P.E.P. § 608.01(p), and the decision of the Federal Circuit set forth in *In re Brana*.  In my opinion, the USPTO modified its approach to examining cancer compounds significantly during the pendency of the applications leading to the '291 patent.

### (b)     The Applicants Did Not Need to Submit Animal Data in Response to the Examiner's Request for Human Data

88.     In ¶ 170 of her report, Ms. Linck asserts that "[t]hroughout prosecution of the applications leading to the '291 Patent, even if needed (which I do not believe they were), Applicants had extensive animal data they could have provided to obtain allowance of the '291 Patent much earlier than they did."  As discussed above in ¶¶ 12, 18, 23, 26, 31, 34, 37, 40, 43, 48, 52, the Examiner was seeking human clinical data, not animal data.  Ms. Linck is incorrect to suggest that applicants could or should have provided animal data in response to the Examiner's repeated requests for successful human clinical data.

3733943_2.DOC

33

89.    In ¶ 173 of her report, Ms. Linck again criticizes applicants for not pursuing the exact course of prosecution that another attorney may have pursued.  While the submission of data via a declaration is available to applicants for patents, Ms. Linck cites no support for her assertion that such submissions are "common practice" and "often . . . successful in obtaining the sought-after patent." (¶ 73.)  The applicants in *Brana* and *Busse* each submitted two expert declarations during the course of prosecuting their patent applications.  None of those declarations proved to be successful in obtaining either of those patents -- *Brana* was eventually decided by the Court of Appeals for the Federal Circuit and *Busse* removed pages of information about anti-neoplastic activity from his specification to obtain allowance.  Busse Amendment Under 37 CFR 1.111 dated October 8, 1987 (CRT_SCH 00259546-549).

(c)    **Successful Human Clinical Data Was Not Available for a Significant Period of Time Prior to Allowance**

90.    In ¶¶ 174-179 of her report, Ms. Linck argues that "Applicants had human data and did not disclose it."  Here, Ms. Linck discusses certain human clinical data on the mitozolomide compound that was available, but overlooks whether or not that data met the Patent Office's requirement that such data be successful human clinical data.  Throughout the prosecution of the applications that led to the '291 patent, the MPEP required that:

> Although absolute safety is not necessary to meet the utility requirement under this section, a drug which is not sufficiently safe under the conditions of use for which it is said to be effective ***will not satisfy the utility requirement*** (*In re Hartop et al.*, 50 CCPA 780, 311 F.2d 249, 135 USPQ 419; *In re Anthony*, 162 USPQ 594 (CCPA 1969); *In re Watson*, 186 USPQ 11 (CCPA 1975)).

M.P.E.P. § 608.01(p) (emphasis added).  I understand that none of the mitozolomide data cited by Ms. Linck meets this requirement, and that, in fact, mitozolomide was abandoned as a viable candidate for a safe and successful human drug.

        (d)      **Alternative Strategies of Patent Prosecution are Always Available to Applicants**

91.     In ¶¶ 180-184 of her report, Ms. Linck argues that an alternative strategy was available to applicants.  Alternative strategies are available in most patent applications.  Applicants are not required to choose any particular strategy.

92.     In ¶ 181 of her report, Ms. Linck again improperly characterizes the Examiner's "objection" to the compound claims in the early patent applications.  As explained supra in ¶¶ 13, 19, 27, the Examiner's choice of the word "objection" instead of "rejection" does not change the fact that a simple terminal disclaimer would not have overcome the Examiner's objection, as Ms. Linck suggests.

        4.      **Applicants Are Not Obligated To Undertake the Expense of an Appeal**

93.     In ¶¶ 185-190 of her report, Ms. Linck argues yet another hypothetical alternative that applicants *could* have pursued -- appealing the Examiner's decision to the Board of Appeals.  She then argues that the facts from *In re Krepelka* are somehow analogous to the actions that applicants could have taken here -- and to the results they would have obtained.  Again, this is after-the-fact speculation.  In reality, other applicants like Brana and Busse -- who also sought patent coverage for anti-cancer drugs -- appealed to the Board of Appeals with dramatically different results.  In both Brana and Busse, the Examiner's utility rejections were upheld by the Board.  In order to obtain allowance of their claims, the applicants in Brana had to go through the additional expense of appealing their case to the Court of Appeals for the Federal Circuit.  Indeed,

the applicants in Busse ultimately resorted to deleting all reference to anti-neoplastic activity from their specification. Busse Amendment Under 37 CFR 1.111 dated October 8, 1987 (CRT_SCH 00259546-549).

94.   There is no obligation that applicants take an appeal to the Board of Appeals, particularly when there is an outstanding request for further data. The facts underlying the *Busse* and *Brana* cases are inconsistent with Ms. Linck's conclusions about what would have happened to the applicants in this case had they appealed to the Board.

## V.   TRIAL EXHIBITS

95.   I may rely on visual aids and demonstrative exhibits that demonstrate the bases for my opinions and that may assist me in explaining the bases for my opinions. These visual aids and demonstrative exhibits may include, for example, excerpts from patent specifications, file histories, deposition testimony and deposition exhibits, as well as charts, diagrams, videos and animated or computer-generated presentations.

96.   I have not yet prepared any exhibits for use at trial in support of the opinions expressed in this report, but I expect to do so in accordance with the Court's scheduling orders.

## VI.   PREVIOUS TESTIMONY AND COMPENSATION

97.   I have testified either by deposition or at trial as an expert in patent law and practice in approximately 190 patent infringement cases. A listing of the matters in which I have provided an expert report or testimony in the last four years is attached as Exhibit C.

98.    I am being compensated for my work on this case at an hourly rate of $600.00, which is my usual rate for consulting work. I have no economic interest in the outcome of this case.

## VII.   SUPPLEMENTATION AND/OR AMENDMENT

99.    I reserve the right to supplement or to amend my opinions in response to opinions expressed by defendant's experts, or in light of any additional evidence, testimony, discovery or other information that may be provided to me after the date of this report. In addition, I expect that I may be asked to consider and testify about such issues that maybe raised by defendant's fact witnesses and technical experts at trial or in expert reports. In such case, it may be necessary for me to modify or supplement my opinions as a result of ongoing expert discovery or testimony at trial.

Dated: January 12, 2009

Prof. Martin J. Adelman